JoNes, Chief Judge,
delivered the opinion of the court:
This is an action for damages alleged to have been incurred as a result of defendant’s breach of contract.
Plaintiff The Blaine Company, a Pennsylvania corporation, contracted as of March 13, 1951 to produce 195,000 fatigue jackets for defendant. Pursuant to the contract, plaintiff was to deliver 29,500 jackets in each of the months May through October of 1951. An additional 12,000 jackets were to be delivered in November of that year. Also contained in the contract was the following clause: “acceleeaTION OP DELIVERY TO MAXIMUM EXTENT DESIRED.”
Herringbone twill cotton cloth was to be furnished by defendant in accordance with an “Availability Schedule for Government Furnished Material” delineated in the contract.[1] The availability schedule was coordinated with plaintiff’s jacket delivery schedule and called for an initial shipment (16 percent of contractual requirements) 45 days prior to plaintiff’s first delivery. In general, the contract provided that 15 days thereafter, defendant was to make the first of 10 shipments, each separated by 15 days, so as to make available in alternative shipments 8 percent and 7 percent of the required material. The contract further provided that:
In the event that any Property is not furnished to the contractor [at the scheduled time] the contracting officer shall, if duly requested by the contractor, make a determination of the delay occasioned the contractor thereby and an equitable adjustment on account of such delay under the section of this contract entitled “Changes”, *55 provided, however, that the Government shall not be liable to the contractor for, and no such adjustment shall include, consequential damages or loss of profit.[2]
Upon notification of availability, plaintiff was to pick up the cloth at the Philadelphia Quartermaster Depot.
Initial availability was scheduled for April 17,1951; plaintiff’s first jacket delivery was set for May 31, 1951. Nevertheless, it was plaintiff’s intention, to which defendant acquiesced, to postpone delivery under the contract in suit until completion of another jacket production contract previously negotiated with defendant. Informing defendant of this intention, plaintiff stated that the contract in suit would still be completed “within the time specified for completion without obligating ourselves to a specified monthly delivery * * * accelerating] if possible.”[3]
As to the contract involved in the present action, plaintiff, on May 11,1951, agreed to begin production June 1,1951, and planned to make the first jacket delivery about July 30,1951.
On April 17,1951, the availability date of the initial shipment, defendant had not made any cloth available. By May 2, 1951, the availability date of the second shipment, defendant was still behind the contract shipment schedule.[4] Neither, at this time, had plaintiff begun to produce jackets under the contract.
But, on June 21,1951, defendant notified plaintiff that over 95,000 yards of cloth (shipped May 14, 25, and 31) had not been picked up and that additional cloth consignments would not be released until such time as it was picked up.
Prior to this, during May 1951, plaintiff, encountering storage difficulties, requested by letter that defendant hold up further shipments. On June 22, 1951, plaintiff picked up the cloth made available in May, as described above, bljf again requested that no more doth be issued to its account until defendant was so notified.
Defendant was notified on July 10 that plaintiff then possessed storage space. Plaintiff advised defendant on July 14 that a minimum 40,000 yards per week would be required *56 to maintain the accelerated production program plaintiff contemplated. Communications throughout July and August (see findings 12 and 13) emphasized plaintiff’s desire for accelerated availability of cloth.
By August 30, 1951, under the contract schedule, defendant should have furnished 457,275 yards of cloth; but as of that date, only 366,685 yards had actually been made available. One reason for defendant’s failure to meet the availability schedule was its mistaken belief that the contract required cloth necessary to produce 155,000 jackets, rather than the 195,000 called for. This error was discovered about the middle of August.
Not until September 24, 1951, had the August 30th requirements been met by defendant. (And it is this 24-day delay that plaintiff stresses.) The concluding shipment, a small quantity relatively, was made about 12 days later than the availability schedule provided.
From the date of defendant’s acceptance of the first shipment of completed jackets (July 12, 1951), plaintiff’s rate of production until the contract was fully complied with (November 5,1951) was an almost unvarying 12,060 jackets per week.
Plaintiff argues that had the balance of cloth due August 30th been available as of that date, rather than September 24th, it could have completed the contract before November 1,1951. Plaintiff thus is asking for increased costs for labor and overhead for the period November 1 through November 5. The latter has been shown by the evidence to be the latest possible date of the contract’s completion.
Properly exhausting its remedies under the disputes clause in the contract, plaintiff asserted before the Armed Services Board of Contract Appeals that labor costs had not been increased, and claimed $1,516.58 for increased overhead for the period November 1 through 10. In a decision, dated August 31, 1956, the Board held that defendant was not in default of its duty to furnish cloth and did not breach the contract. We must review that decision according to the standard of the so-called Wunderlich Act, 68 Stat. 81, 41 Ü.S.C. §321 (1958).
Obviously, defendant did deviate from the contract availability schedule. But plaintiff’s actions, including letters *57 in May and June requesting postponement of deliveries until storage space was available, cannot but be treated as a waiver of its right to defendant’s strict compliance with the schedule.
This is not to say that defendant owed no duty whatsoever regarding dates of availability. Clearly, defendant intended to enforce plaintiff’s contractual obligations. Thus, defendant did owe a duty to make sufficient cloth available at proper times as to enable plaintiff to perform under the contract-^ — that is, to make reasonable shipments under the circumstances. Consideration for defendant’s duty was plaintiff’s forbearance to enforce its right to strict compliance with the availability schedule.
Accordingly, we must determine whether this duty was breached. As heretofore noted, and as shown by finding 19, plaintiff’s rate of production was stable and uniform. The facts and circumstances of record are not sufficient to show that defendant’s deviation caused plaintiff to delay or curtail production. As a matter of fact the contrary seems more likely. Plaintiff argues that by its letters in July and August an intention to accelerate was indisputably indicated. This may well be so. Nevertheless, the acceleration language of the contract was not mandatory. It cannot be construed to give plaintiff the power to unilaterally create a new and different relationship between the parties.
Consequently, the fact that the contract provided that plaintiff’s final delivery of jackets was to be by November 30, 1951, the fact that plaintiff actually completed its performance by November 5, and the fact that this completion date was only 5 days later than plaintiff now contends the contract would have been completed but for the defendant’s deviation, are significant in showing that defendant substantially complied with its duties under the contract.
In light of the facts and their implications as outlined above, the decision of the Armed Services Board of Contract Appeals was not arbitrary and was supported by substantial evidence.[5] As a matter of law, the decision must be sustained.
*58 We hold that plaintiff is not entitled to recover, and its petition is dismissed.
It is so ordered.
Dtjeeee, Judge; LaramoRE, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania having its principal place of business at Philadelphia, Pennsylvania.
2. A Negotiated contract (No. DA 30-280 Q,M 12549 and sometimes referred to as NEG 816) was entered into between plaintiff and defendant as of March 13, 1951. It called for production of 195,000 herringbone twill jackets at a unit price of $0,828, aggregating $161,460, using Government-furnished cloth to be supplied in accordance with an “Availability Schedule.” The contractor, under the terms of the contract, was to deliver 29,500 jackets in each of the months May through October of 1951 with an additional 18,000 jackets to be delivered in November of 1951.
3. The “Availability Schedule for Government Furnished Material,” as set forth in the Contract, reads as follows:
16% of contractual requirements will be initial shipment
8% additional 15 days after initial shipment
7% additional 30 days after initial shipment
8% additional 45 days after initial shipment
7% additional 60 days after initial shipment
8% additional 75 days after initial shipment
7% additional 90 days after initial shipment
8% additional 105 days after initial shipment
7% additional 120 days after initial shipment
*59 8% additional 135 days after initial shipment
7% additional 150 days after initial shipment
5% additional 165 days after initial shipment
4% additional 180 days after initial shipment
Contractor will furnish shipping instructions for Government Furnished Property within forty eight hours after receipt of Notice of Award.
The delivery schedule set forth herein is based on the assumption that the initial delivery of the Government furnished property will be made to the contractor at least 45 calendar days prior to the first scheduled delivery date. In the event this assumption is not realized, the Government will extend each delivery period in the delivery schedule by the number of calendar days that such delivery of Government furnished property is delayed.
4. The initial availability of cloth was scheduled for April 17,1951, and the first jackets were to be delivered by May 31, 1951. The contract stated that tire f.o.b. point for Government-furnished material was “Philadelphia, Pa.”, and the contract further pertinently provided:
31. F.O.B. POINT FOB GOYEBNMENT FUB-NISPIED PBOPEBTY. — Where Government Furnished Property is to be transported at Government expense and the town or city indicated by the Contractor as the f.o.b. point is not served by a railroad, f.o.b. point will be cars railroad freight station nearest to contractor’s plant, unless other transportation involving cost equal to or less than rail transportation is available from the point of origin of the Government furnished property to contractor’s plant. When f.o.b. point for Government Furnished Property is within city in which Government has the property available, contractor will accept Government Furnished Property at depot or installation in that city.
The president of plaintiff understood that, under the terms of the contract, plaintiff was required to pick up the Government-furnished material at the Philadelphia Quartermaster Depot, upon receipt of advices from defendant that such material was available for pickup.
5. The contract also included the following provisions:
32. GOVEBNMENT-FUBNISHED PBOPEBTY
(a) Property to be Furnished. — The Government shall furnish to the contractor for use in connection with *60 and under the terms of this contract the property or equipment (hereinafter referred to as “Property”) which the attached Schedule and/or the specifications state the Government will furnish, at the time or times, if any, and at the place specified therein. Title to the Property shall remain in the Government. The dates fixed for the contractor’s performance of this contract are based upon the expectation that the Property will be furnished to the contractor at the times stated, or if no times are stated, in sufficient time to enable the contractor to meet such dates. In the event that any Property is not furnished to the contractor at such time the contracting officer shall, if duly requested by the contractor, make a determination of the delay occasioned the contractor thereby and an equitable adjustment on account of such delay under the section of this contract entitled “Changes”, provided, however, that the Government shall not be liable to the contractor for, and no such adjustment shall include, consequential damages or loss of profit.
* * S: * *
2. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes, within the general scope of this contract, in any one or more of the following: (i) drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt bv the Contractor of the notification of change: Provided, however, That the Contracting Officer, if he decides that the facts justify such action, may receive and act upon any such claim asserted at any time prior to final payment under this contract. Failure to agree to any adjustment shall be a dispute concerning a question of fact within the meaning of the clause of this contract entitled “Disputes.” However, nothing in this clause shall excuse the Contractor from proceeding with the contract as changed.
*61 12. DISPUTES
Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive: Provided, That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. In connection with any appeal proceeding under this clause, 'the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officer’s decision.
6. The contractor delayed commencing the manufacture of the jackets and made the initial delivery under the contract of 4,020 jackets on July 13, 1951. Prior to delivering jackets under the contract in suit, plaintiff was engaged in producing 100,000 units of the same item for defendant under Contract No. DA 30-280 QM10943 dated February 13, 1951. This earlier contract called for deliveries as follows:
22,980 Each month March and April 1951;
27,000 Each additional May 1951;
27,040 Each additional June 1951.
Plaintiff bid on the contract in suit on February 21, 1951. On March 31,1951, plaintiff also contracted with defendant to produce 64,000 pairs of cooks’ and bakers’ trousers with deliveries scheduled for June through September of 1951.
It was plaintiff’s intention, with concurrence of defendant, to complete delivery on the earlier jacket contract before commencing delivery under the contract in suit.
7. In addition to setting out the delivery schedule referred to in finding 2 above, the following legend was included in the contract documents: “ACCELERATION OF DELIVERY TO MAXIMUM EXTENT IS DESIRED.” *62 Plaintiff’s president understood, however, that he was not obligated to accelerate delivery. Under date of June 2, 1951, plaintiff wrote defendant concerning delinquencies in deliveries on the contract in suit, stating, in part, as follows:
We feel that the effort we are expending in connection with deliveries as evidenced by the tremendous acceleration in deliveries [on the earlier contract for 100,000 units of the same item] in the past several weeks will indicate to you our awareness of our responsibility, and the fact that our contracts will be completed on time, and [the instant contract] may even be possibly completed the early part of September about 7 weeks prior to completion time.
We call your attention to the fact that on the contract in question Neg 316 [the contract in suit] we bid under date of February 21st on the basis of completing this contract within the time specified for completion without obligating ourselves to a specified monthly delivery, advising that we would accelerate if possible.
It was our feeling that since we are delivering jackets, PIBT on a previous contract, and since we were unable to secure any definite information regarding the disposition of our bid on the contract in question until we received telegraphic notice of award under date of March 12th for 155000 units, which was supplemented under date of March 14th changing award to 195000 units, both of which wires specified May and June deliveries, it can be appreciated that since it took more than 30 days before we received notice of award we were unable to intelligently plan and make arrangements to supplement both equipment and personel [sic] to make simultaneous delivery on both contracts.
8. On June 4,1951, plaintiff sent another letter to defendant with respect to the contract in suit, stating, in part, as follows:
Inasmuch as our bid was based upon completion of contract within the specified time, rather than on a monthly basis, we assure you that fulfillment of our obligation will, as advised, be within the time specified for complete delivery, with a good possibility of acceleration as indicated.
At that time plaintiff was delinquent in his deliveries under the earlier contract for 100,000 units of the same item.
*63 9. On. May 11, 1951, plaintiff agreed with, defendant that actual production (cutting) on the contract here in suit would start June 1, 1951, with sewing to commence on June 21, 1951. As of May 11th it was plaintiff’s plan that the first delivery would be ready about July 30, 1951, with an estimated weekly production of 12,000 each during the first and second months and 14,000 each week after the second month, and defendant was advised to that effect.
10. Plaintiff, by letter dated May 16,1951, asked the Government to hold up delivery of cloth for two weeks, and again on May 29,1951, asked for a further two weeks’ delay in the release of Government-furnished cloth. The earlier letter stated, in part, “We find ourselves loaded beyond our capacity on piece goods * *
On June 22,1951, plaintiff wrote defendant as follows:
* * * [P] lease be advised that the following releases have been picked up complete from the Philadelphia Quartermaster Depot.
Voucher # Shipping Date Balance in Yards
264093_25 May 1951 34,6203,4
264471_31 May 1951 30,3743/8
263694_14 May 1951 30,184%
According to our records, this leaves no open balances of piece goods owing us at the present time.
It is most imperative that you do not issue any additional herringbone twill to our account until notified, as we will not be able to warehouse any additional goods for the next several weeks.
11.On June 21, 1951, defendant informed plaintiff that over 95,000 yards of cloth, shipped between May 14 and May 31, 1951, had not yet been picked up by the plaintiff. It further advised that additional consignments of cloth would not be released until the presently available material had been picked up. Then, on July 10, 1951, plaintiff advised that it was in a position to warehouse additional piece goods.
By letter dated July 10, 1951, plaintiff advised defendant as follows:
Kindly refer to contract QM 12549 OI 14880 for 195,000 Jackets, H.B.T.
We are in position to warehouse additional piece goods for the above contract and would appreciate your issuing *64 to the Phila. Quartermaster Depot an additional release for same.
12. By letter of July 14,1951, plaintiff advised defendant, in part, as follows:
* * * [W]e are accelerating delivery on this contract and anticipate completing cutting on same early in the month of August. It is therefore most imperative that you arrange for us to receive a minimum of 40,000 yards of piece-goods each and every week so that we may maintain our acceleration program.
13. On August 13, 1951, plaintiff wrote, in part:
* * * We now find that we only have a two day supply of piece goods on hand and face the necessity of closing down our cutting facilities until more goods are furnished.
A telegram was sent by plaintiff to defendant on August 14, 1951, stating:
* * * OUR LETTER JULY 14TH REQUESTED GFP SECTION 40000 YARDS WEEKLY STOP RECEIVED 72000 YARDS SINCE ABOVE DATE STOP IMPERATIVE WE RECEIVE 50000 YARDS WEEKLY BEGINNING IMMEDIATELY STOP OTHERWISE OPERATION WILL FALL OUT OF WORK ADVISE.
Under dateline 171900Z AUGUST 1951 (apparently sent August 17, 1951) defendant replied as follows:
REURTEL 14 AUGUST SHIPMENT 52,000 YDS HBT TO ARRIVE 21 AUGUST, 33,000 YDS TO ARRIVE 28 AUGUST, 50,000 YDS WEEKLY THEREAFTER UNTIL COMPLETION * * *.
On September 11, 1951, plaintiff wrote defendant in part as follows:
Early in August we advised you that we had been unable to obtain enough government furnished piece goods needed to provide enough cut work to keep our operators from going home. You promised us at that time that we would receive 50,00p yards weekly until completion of this contract so this situation, which is very costly to us and retards our deliveries, would be eliminated. We regret to advise we have only received since that time 91,815 yards and now find ourselves with only enough piece goods on hand to last us two days. UNLESS we receive piece goods before the end of this *65 week, we will have to send about thirty percent of our operators home until such time as we do receive same.
The September 11th letter was followed by a telegram from plaintiff to the same effect, and again on September 24,1951, plaintiff wrote defendant as follows:
We refer you to our numerous telephone calls, letters, telegrams, etc. with reference to piece goods. We also refer you to your wire dated August 20,1951 in connection with this contract, wherein you advise us that you are releasing 52,690% yards, and also telephone conversation with Lt. Grusha, wherein we were advised that 30,000 yards would be released to us the following week and 50,000 yards weekly thereafter until completion. _
_ Under date of August 17th, we telephoned Miss Lillian Deitch in the GFP Section, and again requested information on piece goods. Miss Deitch informed us that we had received 98% of our goods and contract was considered complete. We then spent quite some time on the telephone with Miss Deitch checking our releases against piece goods received and we found that we both tallied exactly.
However, we again started to check piece goods allowances and still found that we were short sufficient piece goods to make up approximately 50,000 jackets. Upon reviewing our file, we found that our contract called for 195,000 jackets. However, when contract was awarded on March 12th, it was awarded for 155,000 jackets and on March 14th your telegram was supplemented, increasing our award to 195,000 jackets.
We then checked the piece goods received and found we had received sufficient piece goods for only 155,000 jackets instead of 195,000 jackets. We again telephoned New York and were advised that an error had been made and that we were correct and we were promised piece goods to be delivered to us today, September 24th.
We have just received two trailers of piece goods at 12:30 P.M. and are in the process of unloading and warehousing this goods. However, in accordance with our letter of September 11th, it has been necessary for us to release operators for the entire week of September 17th and we will not again be able to place these operators until we start to spread and cut this piece goods, which means we will not have work for our operators until about the first of the month on the front operations.
We have not only been inconvenienced, but we have been placed in a position of where our costs have been *66 so materially increased because of the loss of time, the necessity of having people wait around, the indirect labor necessary to handle the final shipment, deficits that are being created by the loss of experienced help and the breaking in of new help, etc. that we feel we are justified in making a claim against the Government on this contract.
However, we do not want to make this claim unless the Quartermaster advises us that we have justification for this claim. If you so advise us, we will immediately have our accountant develop the necessary costs so that we may submit same for your consideration.
Will you please be kind enough to advise us how we shall proceed in this matter ?
14. By letter dated December 17,1953, plaintiff’s attorney presented its claim for damages because of alleged delays in delivery of Govermnent-fumished property under the contract. It was there claimed that delivery of piece goods was not completed until September 24, 1951. In its claim plaintiff did not ask for reimbursement of direct labor and stated that it “only claim[ed] the overhead expense in the period November 1, 1951 to November 10, 1951 attributable to the production of field jackets * * In that claim letter it was further stated:
In the period November 1, 1951 to November 10,1951 our overhead expenses amounted to $3683.71. Field jacket labor in that period amounted to 41.17% of total direct labor applying that percentage to the overhead expenses the amount of overhead attributable to the field jacket contract is the sum of $1516.58.
Please accept this therefore, as statement of the claim of Blaine Company in the amount of $1516.58.
15. On April 21, 1954, the Successor Contracting Officer issued a Decision and Findings of Fact reading, in part, as follows: “* * * [I]t is the finding * * * that you incurred no increased cost as a result of any alleged late delivery of Govermnent Furnished Property * *
16. Notice of appeal to the Secretary of the Army from the decision of the Successor Contracting Officer was received by defendant on May 17, 1954. In that appeal plaintiff again claimed $1,516.58 as damages.
17. The original telegram notifying plaintiff of award of the instant contract provided for the delivery of 155,000 *67 jackets. By telegram dated March 14,1951, this award was increased to 195,000 jackets. Apparently because of the number of jackets involved in the original award, the defendant, through error or oversight, only scheduled initially the release of sufficient material to manufacture 155,000 jackets.
Under the contract specifications, 432,708 yards of material would have been required in order to make 155,000 jackets, while 544,375 yards were required in the manufacture of 195,000 jackets.
18. The due dates of deliveries (i.e., availability) of cloth as required by the availability schedules set forth in the contract, the quantities that were due to be available, the cumulative total quantities received and/or made available at particular dates, and the dates and quantities of each shipment were as follows:

*68 19. The items produced under the contract were accepted by the Government inspectors in the indicated quantities on the inspection dates set forth below, and they were subsequently shipped by the plaintiff on the shipping dates indicated:

*69

20. Plaintiff’s production of 195,000 jackets was completed before Monday, November 5, 1951. Lot 49, consisting of 3,660 jackets, which, brought the total number of jackets to 196,620, was assembled for inspection prior to the morning of November 5,1951, and was inspected and accepted on that date. According to testimony of plaintiff’s president, it is *70 possible that production of 195,000 jackets was completed as early as October 23, 1951, because plaintiff “had a backlog of jackets running all the time.” It is not possible from the record to determine the exact date on which the number called for by the contract were completed. It is clearly established that the contract was fully complied with as of November 5,1951. Plaintiff ultimately delivered more than 195,000 jackets under the provisions of the contract that permitted delivery of an overage of 2 percent. The overage was accepted by defendant.
21. Generally plaintiff’s plant was operating on a five-day week, Monday through Friday, during the year 1951, but some work was performed on Saturdays. Plaintiff did not produce its production records at trial and plaintiff’s president stated at trial that he could not find such records. Without these records he was unable to state with complete accuracy what plaintiff’s production was, except as it was reflected in the inspection reports, and shipping documents.
22. In referring to plaintiff’s claim before the Armed Services Board of Contract Appeals in the amount of $1,516.58, Mr. McDermott, plaintiff’s counsel in the instant case, representing plaintiff at the time, explained that the amount was arrived at as follows:
Plaintiff’s overhead, for the period November 1, 1951, to November 10, 1951, amounted to $3,683.71. Field jacket labor represented 41.17 percent of all of the direct labor, which percent of $3,683.71 is $1,516.68 for the period involved.
Mr. McDermott explained this result as follows:
Direct costs were eliminated because after all the sewing had to be done. If it was done, say, in August, or September, or October, it would have absorbed the overhead expenses charged for those months, but running over into November, the company incurred additional overhead expenses because of the fact that the performance was in November, rather than October, or September.
Plaintiff’s claim (petition) calls for the amount of $7,500. Plaintiff now claims that, after October 31,1951, there were expended in the performance of the contract in suit reason *71 able and necessary expenses of $3,097.35 for labor and $2,533.84 for overhead.
23. At the conclusion of plaintiff’s proof, counsel for defendant made a motion to dismiss on the grounds that:
* * * [T]here has been shown to be no damage arising out of any delay of materials, and there has been no showing by Plaintiff of a connection between any alleged delay in the receipt of Government-furnished material and any costs of operation under the contract, or any additional costs being incurred.
More particularly, based on the documents in evidence before the Court, letters from the contractor to the effect that he anticipated completing his contract in November 1951, and showing that he did not in fact complete it much earlier than the complete month, and didn’t have any idea otherwise.
The motion was denied, and defendant was directed to put on its proof.
24. The record now before the Court does not establish that findings of fact and decisions of the contracting officer and the Armed Services Board of Contract Appeals were arbitrary or capricious or unsupported by substantial evidence.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover and, therefore, its petition is dismissed.

 See finding 3.

 See finding 5.

 See finding 7.

 See finding 18.

 Plaintiff has argued by brief that it should not be bound by this administrative determination, since its president was unable to testify, being disabled *58 by a cerebral hemorrhage. There Is no indication, however, that plaintiff made a timely reguest for postponement of this hearing. A further reason for disregarding this contention is the fact that plaintiff has introduced no evidence which would have materially affected the Board’s decision. As an example, the plaintiff suggests that its president could have testified as to the damages suffered, but since we uphold the Board’s determination that defendant breached no duty, this testimony is not relevant.