Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

AFFIRMED.

**FRANKLIN PAVKOV CONSTRUCTION CO., Appellant,**

v.

**James G. ROCHE, Secretary of the Air Force, Appellee.**

**No. 01–1010.**

United States Court of Appeals, Federal Circuit.

DECIDED: Jan. 28, 2002.

Rehearing Denied March 22, 2002.

Henry P. Wall, Bruner, Powell, Robbins, Wall & Mullins, LLC, of Columbia, SC, argued for appellant.

Timothy P. McIlmail, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Deborah A. Bynum, Assistant Director.

Before CLEVENGER, GAJARSA and DYK, Circuit Judges.

GAJARSA, Circuit Judge.

This is an appeal from the Armed Services Board of Contract Appeals (the "Board"). On appeal, Franklin Pavkov Construction Company ("FPC") seeks an equitable adjustment for claims arising from a fixed-price contract to install four sets of three-story stairs on two dormitory buildings at Shaw Air Force Base, South Carolina (the "Project"). FPC argued that it received defective specifications and defective government-furnished material, and that it was entitled to other adjustments. The Board denied all but one of FPC's claims. We affirm the Board's decision.

## I. BACKGROUND

On October 26, 1995, the Twentieth Contracting Squadron at Shaw Air Force Base, South Carolina (the "Government") awarded the Project to FPC. The Project had been previously bid and contracted to a different contractor in 1991. The previous attempt to implement the project was unsuccessful. In 1995, the Government had the specification, drawings and materials from the incomplete 1991 Project. The Government modified the 1991 specifications and drawings for a second bid process that led to FPC winning the bid for the Project in 1995. These are referred to as the "1995 specifications" and "1995 drawings" in contrast to the "1991 specifications" and "1991 drawings" from the earlier Project. In addition, the Government revised some "shop" drawings generated during the unsuccessful attempt to construct the Project in 1991. These are referred to as the "D & H drawings" (named after the subcontractor who prepared them in 1991).

Mr. Milling, a Government engineer, intended the solicitation for bids to contain (i) the 1995 specifications, (ii) the 1995 drawings (five pages), and (iii) the D & H drawings (six pages). He provided these materials to the Government's office of contracting for distribution to potential bidders. The Board found that when FPC ordered the bid solicitation package, the Government, for unexplained reasons, sent FPC only (i) the 1991 specifications and (ii) the 1995 drawings. The Government did not send FPC the D & H drawings. The front page of the solicitation delineated the documents and exhibits supposedly attached to the solicitation by including the following language:

a. Specifications for Repair Stairs at Dorms 418 and 430

Project SHA 87–0014, dated 3 March 1995.

b. Drawings for Repair Stairs at Dorms 418 and 430

Project SHA 87–0014, 40 pages.

Thus, this language indicated that forty pages of drawings were included, although the Government intended to include only eleven pages of drawings with the pack-

age, and only five pages were sent to FPC. The five pages of 1995 drawings sent to FPC, however, were numbered as sheets one through five of five, respectively. The language also indicated that the 1995 specifications were attached, although FPC received the 1991 specifications.

Mark Pavkov of FPC bid the Project, but his brother, Vince Pavkov, was to implement the Project with another company as a subcontractor to FPC. Mark Pavkov had his brother Vince Pavkov visit the job site twice during the bidding process before the Government awarded the contract.

On October 26, 1995, the Government awarded the Project to FPC as a fixed-price contract for $158,100. The completion date was scheduled for November 26, 1996. At a preconstruction conference held November 16, 1995, the Government gave Vince Pavkov five sets of (i) the 1991 specifications and (ii) the 1995 drawings. In January or February 1996, FPC serendipitously discovered the D & H drawings by hiring an employee who happened to have worked on the unsuccessful 1991 construction of the Project. In mid-September to early October, 1996, when the Project was approximately ninety percent complete, it came to Vince Pavkov's attention that the Government inspector was making statements contrary to the specifications in FPC's possession. The parties compared the specifications in FPC's possession with those in the Government's possession. The Government inspector had been using the 1995 specifications while FPC had been using the 1991 specifications. The Government had the materials and components from the earlier contractor's unsuccessful attempt in 1991 to build the stairs. It listed these in the contract for the Project as material that the Government would furnish. The list included thirty line items, each with an item number, description and quantity. The list had a qualifying statement that the materials were provided "as is and any cleaning, scraping, painting or other forms of reconditioning required to make the material meet specifications shall be the responsibility of the contractor." The contract for the Project also included a short-form Government Furnished Property ("GFP") clause. This clause required the Government to supply GFP identified in the list. Federal Acquisition Regulations ("FAR") Government–Furnished Property (Short Form) § 52.245–4(a); 48 C.F.R. § 52.245–4(a) (2000). However, the contract did not explicitly obligate the government to provide shop drawings as part of the GFP.

Just before FPC started construction, the Government moved the purportedly listed GFP to a fence-enclosed but unlocked location 100 to 200 yards from the job site. The Government made two attempts to meet with Vince Pavkov in November 1995 to take an inventory of the GFP. Vince Pavkov cancelled the first planned meeting. At the second meeting in late November 1995, the parties met at the fenced location and began to take the inventory. However, before completing the inventory, Vince Pavkov had to leave. One of the items that the parties did not inventory were the "stair nosings," devices that prevent slipping on the steps. The GFP list indicated that the Government was to supply eighty-seven stair nosings, but when Vince Pavkov later went to retrieve them he found only ten in the fence-enclosed area. FPC advised the Government of the missing nosings on May 14, 1996, approximately six months after the GFP was delivered. Fabricating and procuring the missing stair nosings had a long lead-time. In order to avoid delaying the Project, FPC obtained permission from the Government to use a substitute aluminum channel.

FPC recognized another problem with the GFP. The configuration of some of the parts caused FPC to question whether all of the stairs were "typical" as shown on the 1995 drawings. After it discovered the D & H drawings, FPC determined that some stair directions were not typical as indicated. The direction of a set of stairs is the direction in which they rise or fall when viewing the side of the building. A note on the D & H drawings indicated that the stair parts may be matched to stairs running in specific directions. This knowledge made the work go more smoothly for FPC. However, for one of the buildings, FPC had to unexpectedly construct new concrete forms for stairs running in the opposite direction in order to use the GFP because some of the stair railings would only fit stairs running in the reverse direction. FPC did not bring the stair direction problem to the attention of the Government until the claim was filed. On March 21, 1997, the Government deemed all the work acceptable and formally accepted it as of that date.

On March 28, 1997, FPC submitted a certified claim to the contracting officer for additional costs and other adjustments, totaling $117,129, and resulting from, among other items, the allegedly defective specifications and the missing GFP. On June 17, 1997, the contracting officer denied FPC's claim. FPC appealed the contracting officer's decision to the Board.

The Board ruled against FPC for all but one count of its claim. *See Franklin Pavkov Constr. Co.,* 2000 ASBCA LEXIS 136, 00–2 B.C.A. (CCH) ¶ 31,100, 153,597, ASBCA No. 50828, 2000 WL 1279909 (Aug. 29, 2000). FPC had alleged that the absence of the 1995 specifications and the D & H drawings amounted to a defective specification. The Board held otherwise. Predicated on a review of the differences between the 1991 and 1995 specifications,

the Board reasoned that FPC's bid, based on the 1991 specifications and 1995 drawings, was for a Project of greater scope and cost than a Project based on the intended bid solicitation package of the 1995 specifications, 1995 drawings and D & H drawings. However, the Government only required FPC to perform the lesser-scope project of the intended bid package. Thus, FPC could not have possibly suffered increased costs due to the absence of the 1995 specifications and D & H drawings. *Id.* at 153,607–08.

The Board found the differences between the 1991 and 1995 specifications to be as follows: (a) the 1995 specifications gave a list of GFP that included a column indicating the number of items anticipated in total for the job, whereas the list FPC received only included the quantity that the Government would furnish; (b) for steel joists, metal roof deck and certain steel stairs work, the 1991 specifications required FPC to generate and submit shop drawings whereas the 1995 specifications indicated that the Government would provide these drawings to FPC; (c) the 1991 specifications required the submission of manufacturer's product descriptions and installation instructions for metal floor deck whereas the 1995 specifications indicated only that any additional metal floor deck required beyond the GFP should match the GFP; (d) the 1991 specifications required a warranty for the roofing, but the 1995 specifications did not; and (e) a different contracting officer signed each version of the specifications. *Id.* at 153,-601–02. In particular, the Board reasoned that FPC could not base its defective specification claim on the additional information in the 1995 specifications because the contract had an order of precedence clause that listed the specifications last, and because the 1995 specifications would have reduced FPC's costs. *Id.* at 153,600, 153,-608. Finally, the Board reasoned that the

Project was not impossible to perform without the omitted information. *Id.* at 153,608.

With respect to the GFP, the Board held that delivery occurred when the Government and Vince Pavkov met in the fence-enclosed location near the job site to inventory the material in late November 1995, before commencement of the work. *Id.* at 153,609. The GFP clause in the contract required FPC to give written notice if the GFP is not suitable for its intended use. The Board reasoned that the notice must be timely and therefore that the contract implicitly required FPC to inventory the GFP even though the contract did not explicitly have a clause requiring the parties to conduct a joint inventory. FPC gave the Government notice of unsuitable GFP in May 1996, six months after the Government and Vince Pavkov first met in the fence-enclosed area. The Board found that this notice was not timely. *Id.* The Board denied FPC's requested relief except as to one count.[1]

On appeal, FPC asserts that it is entitled to equitable adjustment for three reasons: (1) the Government's drawings and specifications were inadequate and incomplete because it failed to furnish FPC with a complete set of drawings and specifications and this delayed and disrupted FPC's progress on the project; (2) the GFP was inadequate and incomplete because it did not comply with the 1995 drawings and this caused FPC additional cost to build additional concrete forms; and (3) the Government never properly discharged its duty to deliver the GFP and is therefore responsible for the costs to replace the missing material. We have jurisdiction under 41 U.S.C. § 607. *See* 41 U.S.C. § 607(g)(1)(A) (1994).

## II. STANDARD OF REVIEW

■ Under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1994), we review the Board's decision according to the following standard:

> [T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

41 U.S.C. § 609(b). Accordingly, we review the Board's legal determinations *de novo*, *see Ingalls Shipbuilding, Inc. v. Dalton*, 119 F.3d 972, 975 (Fed.Cir.1997), and we will not disturb the Board's factual findings unless they are not supported by substantial evidence, *see Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1446 (Fed. Cir.1997); *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1550 (Fed.Cir.1993); *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed.Cir. 1992) ("We ... defer to [the Board's] finding of fact unless unsupported by substantial evidence.") (citing *United States v. DeKonty Corp.*, 922 F.2d 826, 827 (Fed.Cir. 1991)).

## III. DISCUSSION

### A. Adequacy of Drawings and Specifications

■ On appeal, FPC contends that the Board misapplied the *Spearin* doctrine. *See United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). Under the *Spearin* doctrine, when the gov-

---

1. The Board granted FPC's claim for additional time and cost for an unforeseen site

condition related to a drain grate for which the Government directed additional work.

ernment provides a contractor with defective specifications, the government is deemed to have breached the implied warranty that satisfactory contract performance will result from adherence to the specifications, and the contractor is entitled to recover costs proximately flowing from the breach. *See, e.g., Spearin,* 248 U.S. at 136, 39 S.Ct. 59; *Essex Electro Eng'rs, Inc. v. Danzig,* 224 F.3d 1283, 1289 (Fed.Cir.2000); *USA Petroleum Corp. v. United States,* 821 F.2d 622, 624 (Fed.Cir. 1987); *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 609 F.2d 462, 479–80 (Ct.Cl.1979). FPC argues that the Board impermissibly injected an "impossibility" element into the doctrine by stating that it was not impossible for FPC to complete the work with the information contained in the 1991 specifications and 1995 drawings.

We take the Board's analysis of the defective specification issue to mean that this is not a situation where the specification is defective, or, that to the extent the specification is arguably defective by "omission," there are no additional costs flowing proximately from the defect. In either case, we agree with the Board's ultimate conclusion. Thus, the Board's comments that the project was "not impossible" do not create reversible error.

The issue is whether a specification can be defective by omission of information at the solicitation stage when the Government intended to provide the information, but where the contractor instead was provided a subset of the information from which the contractor developed and furnished a fixed-price bid. The answer will turn on the nature of the omitted information and the other facts and circumstances of the situation. Here, the contract was a firm, fixed-price contract that required FPC to "furnish all labor, material, equipment, and transportation and perform all operations necessary to repair" the stairs.

*Pavkov* at 153,600. In essence, as contractors must when they bid fixed-price work, FPC took a certain amount of risk by submitting a bid and ultimately entering into the contract on the basis of the information before it: the 1991 specifications and 1995 drawings. Even though it did not have the 1995 specifications or the D & H drawings, FPC had other opportunities to gather information during the bid process, including visits to the job site by one of its representatives. Moreover, there were no Government responsibilities expressed in the 1991 specifications for it to prepare or supply the additional information contained in the 1995 specifications and D & H drawings.

The contract stated that the Government would provide specifications, which it did at the preconstruction conference. Even though those specifications were the 1991 specifications, FPC does not argue that it was somehow held to a higher standard of performance, or required to supply materially different deliverables on the basis of the 1995 specifications. The record does not show that the Government held FPC to performance standards articulated in the 1995 specifications but not expressed in the 1991 specifications, and that this increased FPC's costs. The record does not show that the Government demanded anything on the basis of the 1995 specifications that increased FPC's costs. Recovery for defective specifications requires proof that the defective specifications increased costs. FPC only argues that its costs would have been reduced if it had received the 1995 specifications because of the information contained therein. However, as the Board reasoned, the 1991 specifications required FPC to do more work, not less, and therefore it had in fact submitted its bid knowing the scope of work required for it to deliver the performance noted in the 1991 specifications.

Even if FPC's costs would have been lower if it had the benefit of the 1995 specifications and D & H drawings, this does not make the specifications defective because the purpose of the *Spearin* doctrine is to allow contractors to recover when the Government does not fulfill its responsibilities in preparing and supplying specifications. Even though the Government intended to distribute the 1995 specifications and D & H drawings, this intent does not mutate into an obligation to do so. Because FPC entered into a fixed-price contract on the basis of the 1991 specifications, and because the Board had substantial evidence to determine that the differences in the 1995 specifications did not increase FPC's costs and that the 1991 specifications in and of themselves were not defective, we agree with the Board's conclusion that any "defect by omission" in this situation is not a defect allowing for recovery.[2]

### B. Delivery of GFP and Notice of Missing Items

FPC next argues that the Government never completed delivery of the GFP. Its logic is as follows. The contract did not state a time or location for delivery. Thus, a reasonable delivery is required. Only after delivery is accepted does the risk of loss shift to FPC. The GFP remained in the care, custody and control of the Government until FPC came to the fence-enclosed area and retrieved it piece by piece. Thus, FPC alleges error by the Board in its holding that delivery occurred when the Government and FPC met in the fence-enclosed area to inventory the GFP in November 1995, which was only a partial inventory due to Vince Pavkov leaving during the inventory process.

The Board decided the GFP issue against FPC on two bases. First, it found that the parties completed delivery and that the risk of loss shifted to FPC. Second, it found that FPC did not timely notify the Government that there were problems with the GFP.

 Both bases go to the question of each parties' respective obligations for delivery of GFP. Although the Government is obligated to supply the GFP, delivery is not a one-sided affair. Delivery is the voluntary transfer of possession. *See* U.C.C. § 1–201(14).[3] A successful transfer requires each party to fulfill its role in

---

**2.** As an additional ground for denying FPC's claim, the Government urges us to reason that FPC cannot recover because it did not notice a "patent defect" in the solicitation; the Government finds this rule expressed by two cases from our predecessor court, the Court of Claims. *Space Corp. v. United States,* 200 Ct.Cl. 1, 470 F.2d 536 (1972); *Highway Products, Inc. v. United States,* 208 Ct.Cl. 926, 530 F.2d 911 (1976). In particular, the Government argues that, if there is an obvious omission in the solicitation, and the contractor knew or should have known about the omission, then a contractor is obligated to bring the omission to the government's attention if the contractor later intends to resolve the issue in its favor. *Space Corp.* at 538; *Highway Products* at 914. The Government argues that FPC should have noticed that it only received five pages of drawings when the solicitation indicated 40 pages of drawings. Given that we have resolved the issue on other grounds, we decline to reach or sanction the Government's arguments on this point.

**3.** Although the Federal Acquisition Regulations are extensive and usually specify the meaning of terms in government contracts, in the past we have relied on the Uniform Commercial Code ("U.C.C.") in cases such as this where a gap needs to be filled or the meaning of a term requires supplementation. *See Texas Instruments Inc. v. United States,* 922 F.2d 810, 814 (Fed.Cir.1990) (citing U.C.C. § 2–209(2) to support the proposition that an integrated executory contract requires a signed writing for modification). Thus, the U.C.C. can inform the analysis of issues raised in government contracts.

conveying the physical possession or control of the GFP. The time, place and manner of delivery, if not specified in the contract or by subsequent agreement of the parties, should be a reasonable time, place and manner that enables the contractor to perform under the contract. *See Blaine Co. v. United States*, 157 Ct.Cl. 53, 57 (1962); U.C.C. § 2–503(1)(a). In other words, absent agreement otherwise, the Government must "put and hold [the GFP] at the [contractor's] disposition and give the [contractor] any notification reasonably necessary to enable the [contractor] to take delivery." U.C.C. § 2–503(1)(a).

Concomitantly, absent agreement otherwise, the contractor has a duty to reasonably respond to such notification. It must promptly and properly receive the GFP to complete delivery. This includes inspecting and taking an inventory of the GFP within a reasonable time. *See* U.C.C. § 2–606(1)(a); *see also* FAR § 52.245–4(b) ("The Contractor shall maintain adequate property control records in accordance with sound industrial practice."). If the contractor does not so inspect and inventory the GFP and promptly notify the Government of any shortcomings, or reject the GFP, acceptance of delivery is deemed to occur. *See* FAR § 52.245–4(a)(1) (requiring a contractor to submit timely written notice to obtain equitable adjustment for ineffective delivery of GFP); *see also* U.C.C. § 2–606(1)(a). Rejection of the GFP is ineffective unless the contractor notifies the Government within a reasonable time. *See* FAR § 52.245–4(a)(1); *see also* U.C.C. § 2–602(2)(a). Timely notification of any deficiencies with the GFP provides the Government an opportunity to cure.

In *Blaine*, the contract obligated the government to supply cloth for the contractor to manufacture jackets for the Army under a delivery schedule spanning seven months in 1951. *Blaine*, 157 Ct.Cl. at 54. So that the contractor could complete another jacket-manufacturing contract, the parties agreed to delayed deliveries of cloth and jackets during the first few months of the schedule, with the entire contract to be completed by the final delivery. *Id.* at 55. The government made the cloth available at a government facility, but the contractor delayed in picking up the cloth because the contractor was unable to secure storage space. *Id.* The contractor was five days late for final delivery and sought to recover labor and overhead costs for these five days, alleging that the delay resulted from the government's failure to deliver sufficient quantities of cloth in time for the contractor to manufacture the jackets by the deadline. Our predecessor court, the Court of Claims, held that once the parties deviated from the original schedule, the government's duty was to "make sufficient cloth available at proper times to enable [the contractor] to perform under the contract—that is, to make reasonable shipments under the circumstances." *Id.* at 57.

■ As in *Blaine*, the Government here tendered delivery of the GFP in a time, place and manner that enabled FPC to perform the contract. Therefore, the Board had substantial evidence to conclude that any issues of delivery, or resulting problems with the GFP, are not a basis of recovery due to: (i) the risk of loss shifting to FPC because it did not inspect and inventory the GFP within a reasonable time; and (ii) FPC's failure to timely notify the Government of problems with the GFP.

■ The Board found that the GFP was available for use by FPC from the day the work began. *Pavkov*, at 153,608. The contract did not specify a time for delivery, thus the Government is "obligated to deliver the [GFP] in sufficient time for it to be

installed in the ordinary and economical course of performance." *Pavkov*, at 153,-608 (citing *Peter Kiewit Sons' Co. v. United States*, 138 Ct.Cl. 668, 674–75, 151 F.Supp. 726 (1957); *Oxwell, Inc.*, 86–2 B.C.A. (CCH) ¶ 18,967, 95,776, ASBCA No. 27523 (June 2, 1990)). FPC claims that the Government never completed delivery. However, FPC ignores its own duty in the delivery process. FPC was willing to meet the Government at the fence-enclosed location to undertake an inventory of the GFP. This indicates that the fence-enclosed location was of a time, place and manner for delivery acceptable to both parties. Given that the contract did not specify formalities of delivery, this meeting constituted a reasonable tender of delivery and notice to FPC that the Government had put the GFP at FPC's disposition for it to construct the Project. FPC should have promptly and properly "received" the GFP at that time by inspection and inventory. FPC removed material from the fence-enclosed location without complaint as to delivery by that method. FPC had the opportunity to inspect and inventory the GFP on the day of the meeting and every day thereafter. That it never did so is due to no fault of the Government. Because FPC failed to fully inspect and inventory the GFP within a reasonable time, the Board was justified in deeming delivery to occur at the initial meeting in the fence-enclosed location. With delivery deemed to have occurred at that time, it was not error for the Board to apply the contract's risk of loss provision against FPC.

 The contract's GFP clause requires FPC to submit a timely written request to obtain an equitable adjustment for flawed or missing GFP. The Board reasoned that implicit in this written request provision is

the requirement that FPC inspect and inventory the GFP upon receipt. *Pavkov* at 153,609 (citing *Logicon, Inc.*, 90–2 BCA ¶ 22,786, ASBCA No. 39683, 1990 WL 42074 (Apr. 3, 1990)).[4] FPC never fully inspected or inventoried the GFP. As a result, FPC delivered notice of missing GFP to the Government on May 14, 1996, six months after the Government and FPC partially inventoried the GFP. This delay is almost half of the estimated contract length of one year. FPC did not provide timely notice to the Government of any problems arising with the GFP as delivered. This untimely notice did not give the Government an opportunity to cure any deficiency. The Board correctly concluded that FPC's notice was not timely and proper notification of defective or missing GFP was not issued within a reasonable time after the meeting at the fence-enclosed location.

In sum, in a case where the contract does not specify the formalities of delivery, the Government reasonably met its delivery obligations by making the GFP available to FPC in a reasonable time, place and manner. However, FPC failed to discharge its obligations in the delivery process, neglecting to inspect and inventory the GFP, thereby also failing in its duty to notify the Government of any deficiencies in the inventory, which would allow the Government the opportunity to cure any such deficiencies. Therefore, the Board's legal determinations concerning delivery are correct.

### C. Suitability of the GFP

 FPC also argues that the Government violated its contractual requirement that the GFP be suitable for its intended use. FPC contends that the GFP was not

---

4. The Government relies on *Logicon* for the proposition that FPC was obligated promptly to inspect the GFP. Under *Logicon,* the Government in essence has to show that the delay in notification was prejudicial. FPC does not contend that the Government was not prejudiced by FPC's delay.

suitable because it did not conform to the 1995 drawings, resulting in additional cost for FPC. FPC complains that the Board never addressed this element of FPC's equitable adjustment claim and it argues that if the Government had provided it with a complete drawing set the problems would have been less costly. FPC's arguments are not persuasive. We have concluded that the Government had no obligation to supply the drawings. FPC therefore cannot recover alleged damages resulting from its unawareness of those drawings.

## CONCLUSION

Because we hold that the Board's findings are supported by substantial evidence, and its legal conclusions are correct that FPC does not have a claim for recovery arising from the specifications and drawings, and did not timely notify the Government of the missing items of GFP, we affirm the Board's decision.

*AFFIRMED.*

## COSTS

Each party bears its own costs.