# UNITED STATES v. SPEARIN.

# SPEARIN v. UNITED STATES.

## APPEALS FROM THE COURT OF CLAIMS.

Nos. 44, 45. Argued November 14, 15, 1918.—Decided December 9, 1918.

S agreed, for a lump sum, to build a dry-dock in a Navy Yard in accordance with plans and specifications prepared by the Government and which provided, *inter alia*, for reconstructing a sewer which intersected the site, and prescribed the new location, dimensions, and materials therefor. S rebuilt the sewer as so required, and it was accepted by the Government, but owing to a dam, unknown to both parties, existing in a connecting sewer, within the Yard but beyond the limits of the operations, and to general conditions of drainage, known to the Government but not to S, back waters burst the new sewer, during heavy rain and high tide, and flooded the dry-dock excavation, .causing damage and menacing the work. S, having declined to proceed unless the Government paid or assumed the damage and made safe the sewer system or assumed'responsibility for future damage due to insufficient capacity, location and design, the Government annulled the contract.

*Held:* (1) The provision for reconstructing the sewer was part of the dry-dock contract and not collateral to it. P. 136.

(2) The articles prescribing the character, dimensions, and location of the sewer imported a warranty that if so constructed the sewer would prove adequate. P. 137.

(3) Such warranty was not overcome by general clauses requiring the contractor to examine the site, check up the plans, and assume responsibility for the work until completion and acceptance. *Id.*

(4) Neither Rev. Stats., § 3744, providing that contracts with the Navy Department shall be reduced to writing, nor the parol evidence rule, precluded reliance on such warranty, implied by law. *Id.*

(5) The contractor, upon breach of the warranty, was not obliged to reconstruct the sewer and proceed at his peril, but, upon the Government's repudiation of responsibility, was justified in refusing to resume work on the dry-dock. P. 138.

(6) Having annulled the contract, the Government was liable for all damages resulting from the breach, including the contractor's proper

expenditures on the work (less receipts from the Government) and the profits he would have earned if allowed fully to perform.　*Id.* 51 Ct. Clms. 155, affirmed.

THE case is stated in the opinion.

*Mr. Assistant Attorney General Thompson* for the United States.

· *Mr. Charles E. Hughes,* with whom *Mr. Frank W. Hackett* and *Mr. Alfred S. Brown* were on the brief, for Spearin.

MR. JUSTICE BRANDEIS delivered the opinion of the court.

Spearin brought this suit in the Court of Claims, demanding a balance alleged to be due for work done under a contract to construct a dry-dock and also damages for its annulment.　Judgment was entered for him in the sum of $141,180.86; (51 Ct. Clms. 155) and both parties appealed to this court.　The Government contends that Spearin is entitled to recover only $7,907.98.　Spearin claims the additional sum of $63,658.70.

*First.* The decision to be made on the Government's appeal depends upon whether or not it was entitled to annul the contract.　The facts essential to a determination of the question are these:

· Spearin contracted to build for $757,800 a dry-dock at the Brooklyn Navy Yard in accordance with plans and specifications which had been prepared by the Government.　The site selected by it was intersected by a 6-foot brick sewer; and it was necessary to divert and relocate a section thereof before the work of constructing the dry-dock could begin.　The plans and specifications provided that the contractor should do the work and prescribed the dimensions, material, and location of the section to be

substituted. All the prescribed requirements were fully complied with by Spearin; and the substituted section was accepted by the Government as satisfactory. It was located about 37 to 50 feet from the proposed excavation for the dry-dock; but a large part of the new section was within the area set aside as space within which the con- tractor's operations were to be carried on. Both before and after the diversion of the 6-foot sewer, it connected, within the Navy Yard but outside the space reserved for work on the dry-dock, with a 7-foot sewer which emp- tied into Wallabout Basin.

About a year after this relocation of the 6-foot sewer there occurred a sudden and heavy downpour of rain coincident with a high tide. This forced the water up the sewer for a considerable distance to a depth of 2 feet or more. Internal pressure broke the 6-foot sewer as so relocated, at several places; and the excavation of the dry-dock was flooded. Upon investigation, it was dis- covered that there was a dam from 5 to $5\frac{1}{2}$ feet high in the 7-foot sewer; and that dam, by diverting to the 6-foot sewer the greater part of the water, had caused the internal pressure which broke it. Both sewers were a part of the city sewerage system; but the dam was not shown either on the city's plan, nor on the Government's plans and blue-prints, which were submitted to Spearin. On them the 7-foot sewer appeared as unobstructed. The Govern- ment officials concerned with the letting of the contract and construction of the dry-dock did not know of the existence of the dam. The site selected for the dry-dock was low ground; and during some years prior to making the contract sued on, the sewers had, from time to time, overflowed to the knowledge of these Government officials and others. But the fact had not been communicated to Spearin by anyone. He had, before entering into the contract, made a superficial examination of the premises and sought from the civil engineer's office at the Navy

Yard information concerning the conditions and probable cost of the work; but he had made no special examination of the sewers nor special enquiry into the possibility of the work being flooded thereby; and had no information on the subject.

Promptly after the breaking of the sewer Spearin notified the Government that he considered the sewers under existing plans a menace to the work and that he would not resume operations unless the Government either made good or assumed responsibility for the damage that had already occurred and either made such changes in the sewer system as would remove the danger or assumed responsibility for the damage which might thereafter be occasioned by the insufficient capacity and the location and design of the existing sewers. The estimated cost of restoring the sewer was $3,875. But it was unsafe to both Spearin and the Government's property to proceed with the work with the 6-foot sewer in its then condition. The Government insisted that the responsibility for remedying existing conditions rested with the contractor. After fifteen months spent in investigation and fruitless correspondence, the Secretary of the Navy annulled the contract and took possession of the plant and materials on the site. Later the dry-dock, under radically changed and enlarged plans, was completed by other contractors, the Government having first discontinued the use of the 6-foot intersecting sewer and then reconstructed it by modifying size, shape and material so as to remove all danger of its breaking from internal pressure. Up to that time $210,939.18 had been expended by Spearin on the work; and he had received from the Government on account thereof $129,758.32. The court found that if he had been allowed to complete the contract he would have earned a profit of $60,000, and its judgment included that sum.

The general rules of law applicable to these facts are well

settled. Where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered. *Day* v. *United States*, 245 U. S. 159; *Phœnix Bridge Co.* v. *United States*, 211 U. S. 188. Thus one who undertakes to erect a structure upon a particular site, assumes ordinarily the risk of subsidence of the soil. *Simpson* v. *United States*, 172 U. S. 372; *Dermott* v. *Jones*, 2 Wall. 1. But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications. *MacKnight Flintic Stone Co.* v. *The Mayor*, 160 N. Y. 72; *Filbert* v. *Philadelphia*, 181 Pa. St. 530; *Bentley* v. *State*, 73 Wisconsin, 416. See *Sundstrom* v. *New York*, 213 N. Y. 68. This responsibility of the owner is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work, as is shown by *Christie* v. *United States*, 237 U. S. 234; *Hollerbach* v. *United States*, 233 U. S. 165, and *United States* v. *Utah &c. Stage Co.*, 199 U. S. 414, 424, where it was held that the contractor should be relieved, if he was misled by erroneous statements in the specifications.

In the case at bar, the sewer, as well as the other structures, was to be built in accordance with the plans and specifications furnished by the Government. The construction of the sewer constituted as much an integral part of the contract as did the construction of any part of the dry-dock proper. It was as necessary as any other work in the preparation for the foundation. It involved no separate contract and no separate consideration. The contention of the Government that the present case is to be distinguished from the *Bentley Case*, *supra*, and other similar cases, on the ground that the contract with reference to the sewer is purely collateral, is clearly without

132.                    Opinion of the Court.

merit.   The risk of the existing system proving adequate
might have rested upon Spearin, if the contract for the
dry-dock had not contained the provision for relocation
of the 6-foot sewer.   But the insertion of the articles pre-
scribing the character, dimensions and location of the
sewer imported a, warranty that, if the specifications were
complied with, the sewer would be adequate.   This im-
plied warranty is not overcome by the general clauses
requiring the contractor, to examine the site,[1] to check up
the plans,[2] and to assume responsibility for the work until
completion and acceptance.[3]   The obligation to examine
the site did not impose upon him the duty of making a
diligent enquiry into the history of the locality with a
view to determining, at his peril, whether the sewer spe-
cifically prescribed by the Government would prove ade-
quate.   The duty to check plans did not impose the ob-
ligation to pass upon their adequacy to accomplish the
purpose in view.   And the provision concerning contract-
or's responsibility cannot be construed as abridging rights
arising under specific provisions of the contract.

Neither § 3744 of the Revised Statutes, which pro-

---

[1] "271. *Examination of site.*—Intending bidders are expected to
examine the site of the proposed dry-dock and inform themselves
thoroughly of the actual conditions and requirements before submitting
proposals."

[2] "25. *Checking plans and dimensions; lines and levels.*—The con-
tractor shall check all plans furnished him immediately upon their
receipt and promptly notify the civil engineer in charge of any dis-
crepancies discovered therein.   .   .   .   The contractor will be held
responsible for the lines and levels of his work, and he must combine
all materials properly, so that the completed structure shall conform
to the true intent and meaning of the plans and specifications."

[3] "21. *Contractor's responsibility.*—The contractor shall be respon-
sible for the entire work and every part thereof, until completion and
final acceptance by the Chief of Bureau of Yards and Docks, and for
all tools, appliances, and property of every description used in connec-
tion therewith.   .   .   ."

vides that contracts of the Navy Department shall be reduced to writing, nor the parol evidence rule, precludes reliance upon a warranty implied by law. See *Kellogg Bridge Co.* v. *Hamilton,* 110 U. S. 108. The breach of warranty, followed by the Government's repudiation of all responsibility for the past and for making working conditions safe in the future, justified Spearin in refusing to resume the work. He was not obliged to restore the sewer and to proceed, at his peril, with the construction of the dry-dock. When the Government refused to assume the responsibility, he might have terminated the contract himself, *Anvil Mining Co.* v. *Humble,* 153 U. S. 540, 551–552; but he did not. When the Government annulled the contract without justification, it became liable for all damages resulting from its breach.

*Second.* Both the main and the cross-appeal raise questions as to the amount recoverable.

The Government contends that Spearin should, as requested, have repaired the sewer and proceeded with the work; and that having declined to do so, he should be denied all recovery except $7,907.98, which represents the proceeds of that part of the plant which the Government sold plus the value of that retained by it. But Spearin was under no obligation to repair the sewer and proceed with the work, while the Government denied responsibility for providing and refused to provide sewer conditions safe for the work. When it wrongfully annulled the contract, Spearin became entitled to compensation for all losses resulting from its breach.

Spearin insists that he should be allowed the additional sum of $63,658.70, because, as he alleges, the lower court awarded him (in addition to $60,000 for profits) not the difference between his proper expenditures and his receipts from the Government, but the difference between such receipts and the *value* of the work, materials, and plant (as reported by a naval board appointed by the de-

fendant).    Language in the findings of fact concerning damages lends possibly some warrant for that contention; but the discussion of the subject in the opinion makes it clear that the rule enunciated in *United States* v. *Behan,* 110 U. S. 338, which claimant invokes, was adopted and correctly applied by the court.

   The judgment of the Court of Claims is, therefore,

                                        *Affirmed.*


   (MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.)