## CENTRAL OHIO JOINT VOCATIONAL SCHOOL DISTRICT BOARD OF EDUCATION, Appellant,

### v.

## PETERSON CONSTRUCTION COMPANY et al., Appellees.

[Cite as *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Peterson Constr. Co.* (1998), 129 Ohio App.3d 58.]

Court of Appeals of Ohio,
Twelfth District, Madison County.

Nos. CA97–05–024 and CA97–05–026.

Decided July 13, 1998.

**60**

---

*Zeiger & Carpenter, Steven W. Tigges, Michael Romanello* and *Mary F. Prechtel,* for appellant.

*Taft, Stettinius & Hollister, Gerald J. Rapien* and *Daniel R. Warncke,* for appellee Peterson Construction Company.

*Kegler, Brown, Hill & Ritter* and *Donald W. Gregory,* for appellee George J. Igel & Co.

WALSH, Judge.

Plaintiff-appellant Central Ohio Joint Vocational School District Board of Education ("the board") appeals a jury verdict rendered in the Madison County Court of Common Pleas in favor of appellees, Peterson Construction Company ("Peterson") and George J. Igel and Company ("Igel"), in a dispute arising out of the expansion of the Tolles Technical Center ("the school"). We affirm.

On March 26, 1994, the board entered into a construction contract ("the contract") with Peterson for a nine million dollar expansion of the school. Peterson subcontracted with Igel to perform soil excavation at the school expansion site. Before construction began, the board separately hired Dunbar Geotechnical Engineers ("Dunbar") to test the soil subsurface and to act as the soil engineer throughout the construction. Ultimately, the school expansion was built on a peat bog, an underground deposit of weak, organic soil. Once construction was completed, the school building "settled," causing extensive damage. Peterson and the board agreed that Peterson would repair the damage under a supplemental Interim Reconstruction Funding Agreement ("IRFA"). The IRFA reserved issues of liability until the construction was completed.

On July 24, 1995, the board sued Dunbar and Peterson for breach of contract and negligence. On September 20, 1995, Peterson answered the complaint, filed a counterclaim against the board for breach of contract, and a cross-claim against Dunbar for negligence and breach of contract.[1] Before trial, all claims against Dunbar were dismissed and the claims of negligence were dismissed. Following a two-week jury trial that ended August 24, 1996, the jury found against the board. On Peterson's counterclaim, the jury awarded $323,436.82. On May 14, 1997, the court entered final judgment, amending the award on the counterclaim to $390,190.36. The board filed a timely notice of appeal, and Peterson filed a notice of cross-appeal. This court consolidated the appeals on or about June 17, 1997. Peterson moved to dismiss the cross-appeal, which motion was granted by this court on or about March 19, 1998. The board presents two assignments of error for our review:

"The trial court erred by allowing the jury to decide the meaning of the key contract provision at issue, Section 2100–3.02(A).

"The trial court erred to the prejudice of the school board by improperly instructing the jury on the '*Spearin* doctrine' over the school board's objections."

---

1. Peterson also filed a third-party complaint against Igel for indemnification if Peterson was found liable to the board.

## Introduction

Before construction ever began, the board hired Dunbar to perform soil analysis of the site and to recommend a solution to any inadequate subsurface conditions. The testing revealed that very soft, organic soil existed in the northwest corner of the construction site. On October 19, 1993, November 28, 1993, and February 4, 1994, Dunbar issued preconstruction reports on the site. Due to those reports, the board included specific contractual requirements for the excavation of the material in the northwest corner of the site. These requirements were largely contained in Section 2100, Paragraph 3.02(A).

The parties regularly at the site included Alan Stechschulte, who acted as project superintendent for Peterson, and Ben Backus, a soil engineer from Dunbar. On June 4, 1994, excavation began on the northwest corner of the site, and Igel excavated to an elevation of nine hundred thirty-three feet. However, at that depth, the bottom of the excavation was still too soft and wet. On June 8, 1994, a meeting took place to discuss the organic soil problem. At the meeting, representatives of Dunbar, the board, and Peterson discussed possible solutions.

The board and Peterson dispute the outcome of the meeting. Peterson claims the agreement was to excavate as far as Dunbar deemed necessary and use a three-foot layer of stones at the bottom of the excavation. According to Peterson, the other suggestion, ultimately not adopted, was to excavate all the soft, organic soil. After the meeting, a change order to the construction contract was written and signed by representatives of Peterson and the board. The change order required Peterson to "[f]urnish all material and perform all labor to deliver, place and compact additional stone base material to stabilize bottom of excavated area where unsuitable soil was removed * * *. Place stone material as directed by Dunbar Geotechnical Engineers, Inc." The board insists that the change order was not an alternative approach, but represented an additional requirement of the contract.

## Is the Term "FULL DEPTH" Unambiguous?

██ In the first assignment of error, the board asserts that the trial court erred in allowing the jury to interpret the contract provision that is at the center of this dispute. The provision is Section 2100–3.02(A), which states:

"Within limits of new building and pavement construction and to a line at least 5'—0" beyond, remove to FULL DEPTH all topsoil, fill material and zones of organic soil. Soil borings within the Academic Building indicate the presence of unsuitable fill material to the approximate elevations indicated on drawings, sheet C2.01. At the west side of the building, within the limits indicated on Sheet C2.01, remove existing soils to an average elevation of approximately 933.0'. Slope, shore or brace excavation walls as required by conditions encountered. Within limits of

new pavements north and west of the academic building, within the limits indicated on Sheet C2.01, remove existing soils to an average elevation of approximately 949.0'. Extend excavation to additional depths as required at points where existing drainage swale crosses new drive. Extent of removal of existing fill materials will be closely monitored by Soils Engineer."

■ The board alleges that the first sentence of the above contract provision is "clear and unambiguous" and should have been interpreted by the trial judge. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." *Inland Refuse Transfer Co. v. Browning–Ferris Industries of Ohio, Inc.* (1984), 15 Ohio St.3d 321, 322, 15 OBR 448, 449, 474 N.E.2d 271, 272. "However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term." *Id.* The board argues that the term "FULL DEPTH" clearly required all organic soil to be removed by Peterson. Appellees insist that the provision, taken in proper context, is either ambiguous or contradicts the board's interpretation.

Expert witness David Breitfeller, a civil engineer, testified that "FULL DEPTH" meant to dig as far as the soil engineer required. Breitfeller's interpretation is bolstered by the final sentence of Section 2100–3.02(A), which required excavation to be closely monitored by the soil engineer. However, the board points to Section 2100–2.02(G) of the contract, which states that "[e]mployment of a Soils Engineer by Owner shall not relieve the Contractor of his sole responsibility to furnish materials and construction in compliance with the Contract Documents." One reasonable interpretation of "compliance with the Contract Documents" is that Peterson should rely on the expert opinion of Dunbar's soil engineer. In fact, Section 2100–3.04(C) provides in relevant part: "Remove soft, wet or weak areas as directed by the soils engineer. THIS OPERATION IS TO BE CLOSELY MONITORED BY SOILS ENGINEER AND NO FILL MATERIAL OR PAVEMENT BASE IS TO BE PLACED WITHOUT PRIOR APPROVAL OF SOILS ENGINEER."

Also, after the first sentence of Section 2100–3.02(A), the remainder of the section refers to removing all existing soil to an average elevation of approximately nine hundred thirty-three feet on the west side of the school and nine hundred forty-nine feet on the northwest side. Peterson argues that these provisions provided specific instructions for the soil excavation and that "FULL DEPTH" is a general contract term, applicable where no specific contract provision governs. The board counters that "FULL DEPTH" refers to removing all soft, organic soil and that the rest of Section 2100–3.02(A) is a separate, minimum excavation requirement for any type of soil.

Having reviewed the record, we find that Section 2100–3.02(A), including the term "FULL DEPTH," is reasonably subject to either interpretation and its meaning was properly a jury question. *Inland Refuse Transfer Co.,* 15 Ohio St.3d at 322, 15 OBR at 448–449, 474 N.E.2d at 272–273, citing *Hallet & Davis Piano Co. v. Starr Piano Co* (1911), 85 Ohio St. 196, 97 N.E. 377.

Even assuming we could accept the board's argument that the term "FULL DEPTH" created a clear and unambiguous obligation for Peterson to remove all soft, organic soil, the parties agreed to a change order. One reasonable interpretation of the June 8, 1994 meeting and subsequent change order is that the parties modified section 2100–3.02(A) of the contract. The modification allowed Dunbar to control the depth of soil excavation before adding the layer of stones. However, because other interpretations of the change order are plausible, the jury was entitled to resolve this ambiguity. The first assignment of error is overruled.

In the second assignment of error, the board claims that the trial court improperly instructed the jury on the *Spearin* doctrine. See *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166, 54 Ct.Cl. 187. The *Spearin* doctrine generally holds that when a contractor follows an owner's plans, the owner impliedly warrants that the plans are accurate. *Id.* at 136, 39 S.Ct. at 61, 63 L.Ed. at 169. If the construction is revealed to be defective, the owner is the responsible party. *Id.* Before addressing the merits of the board's second assignment of error, we consider appellees' argument that, due to the two-issue rule, the propriety of the *Spearin* doctrine jury instruction is moot.

### Two-Issue Rule

The two-issue rule provides that where a general verdict is granted and the jury was not given interrogatories revealing the basis for the verdict, it is presumed that all disputed issues were resolved in favor of the prevailing party. *Sites v. Haverstick* (1873), 23 Ohio St. 626, 1873 WL 25, paragraph one of syllabus; *McCarthy v. Kasperak* (1981), 3 Ohio App.3d 206, 208, 3 OBR 234, 236–237, 444 N.E.2d 472, 474–475. Therefore, if a single determinative issue was presented free from error, another issue could not prejudice the outcome.

In this case, the jury could have rejected the board's claim for two reasons. The jury could have found either that (1) Peterson did not breach the contract or (2) Peterson did breach the contract, but was excused under the *Spearin* doctrine. The two-issue rule would presume that the jury found that Peterson did not breach the contract and that the *Spearin* doctrine was irrelevant to the jury's decision. However, the two-issue rule cannot be applied where the jury was given an incorrect jury instruction on a point of substantive law. *Sapp*

*v. Stoney Ridge Truck Tire* (1993), 86 Ohio App.3d 85, 97, 619 N.E.2d 1172, 1179–1180, citing *Ricks v. Jackson* (1959), 169 Ohio St. 254, 8 O.O.2d 255, 159 N.E.2d 225, paragraph four of syllabus. Therefore, the question remains whether the *Spearin* doctrine jury instruction was improperly given by the trial court. We therefore must address whether the *Spearin* doctrine applies to this case.[2]

### *Spearin* Doctrine

As noted, the *Spearin* doctrine holds that, in general, when a contractor is required to follow plans and instructions of the owner, the owner impliedly warrants the accuracy of the plans and specifications. *Spearin,* 248 U.S. at 136, 39 S.Ct. at 61, 63 L.Ed. at 169. Therefore, the contractor is not responsible for construction defects if the plans and instructions of the owner were strictly followed. *Id.* The board argues that due to exceptions to the *Spearin* doctrine, the jury was not entitled to consider the *Spearin* doctrine as a matter of law. Specifically, the board argues the following exceptions: (1) the contract provided express disclaimers to the board's liability, (2) Stechschulte was aware that the soil excavation was inadequate to support the school expansion, and (3) Peterson expressly warranted its work. We address each exception separately.

### Express Disclaimer of Liability Exception

The board first avers that the *Spearin* doctrine is inapplicable because the contract specifically disclaimed the board's liability for soil conditions. The leading case in Ohio for this exception is *S&M Constructors v. Columbus* (1982), 70 Ohio St.2d 69, 24 O.O.3d 145, 434 N.E.2d 1349. That case concerned a sewer construction project in which delays occurred due to the subsurface conditions. The relevant contract clause stated that " '[t]he Contractor agrees that he will make no claim against the City or the Engineer if, in carrying out the work, he finds that the actual subsurface conditions encountered do not conform to those indicated by said borings, test excavations, and other subsurface investigations.' " *Id.,* 70 Ohio St.2d at 70, 24 O.O.3d at 145–146, 434 N.E.2d at 1351. After concluding that the language was "clear and unambiguous," the court, under basic contract law, found that the city of Columbus was not liable. *Id.* at 75, 24 O.O.3d at 148, 434 N.E.2d at 1353–1354.

---

**2.** Appellees' alternate argument is that the jury instructions provided that Peterson could receive damages only if Peterson did not breach the contract. Since Peterson was awarded damages on its counterclaim, appellees argue that the jury never considered the *Spearin* doctrine excuse. In essence, appellees ask this court, without any supporting case law or statute, to substitute the jury instructions for specific interrogatories. We reject this argument, which, if applied, would effectively bypass the limitations of the two-issue rule. See *Ricks,* paragraph four of syllabus.

The board cites three sections of the contract as express disclaimers of the board's liability. First, Section 2100–1.03(D) provides that "[n]o responsibility is assumed by Owner or Architect for the accuracy of the subsurface data provided." Next, Section 2.2.2 of the General Conditions of the contract reads:

"The furnishing by the Owner of the information set forth herein shall not relieve the Contractor from its duties under the Contract Documents. The Owner does not assume any responsibility for the sufficiency or accuracy of the information provided hereunder. * * * The Contractor shall undertake such further investigations and studies as may be necessary or useful to determine subsurface characteristics and conditions."

Finally, the previously cited Section 2100–2.02(G) provides that Peterson has "sole responsibility" for "materials and construction."

In our view, a reasonable interpretation of the evidence is that all of these sections were modified by the change order. As already stated, the change order can be reasonably viewed as giving Dunbar the responsibility for the depth of excavation and adding the layer of stones. Further, the provisions cited by the board are potentially in conflict with Section 2100–3.04(C), which states, "THIS OPERATION IS TO BE *CLOSELY MONITORED* BY SOILS ENGINEER AND NO FILL MATERIAL OR PAVEMENT BASE IS TO BE PLACED WITHOUT PRIOR APPROVAL OF SOILS ENGINEER." (Emphasis added.) The final sentence of Section 2100–3.02(A) also includes the phrase "closely monitored." The jury was entitled to conclude that the phrase "closely monitored" imposed an obligation on Ben Backus, the Dunbar soil engineer hired by the board, and was not superfluous to the contract.

In short, we find the disclaimer of liability exception inapplicable in this case. Unlike *S&M Constructors*, the contract clauses that the board insists disclaim liability, taken in context, are not "clear and unambiguous." In fact, one reasonable interpretation is that the contract requires the excavation to be completed according to the instructions of Ben Backus.

Even if the contract could be construed to constitute an express disclaimer of liability by the board, *S&M Constructors* did not involve a changed-conditions clause.[3] In *S&M Constructors*, the contractor agreed to an express disclaimer of liability by the city of Columbus. The contractor cited cases where, due to a changed-conditions clause, the *Spearin* doctrine was applied, despite express waivers of liability by the property owner. The *S&M Constructors* court noted that a changed-conditions clause was not present and concluded, "Obviously,

---

**3.** Breitfeller testified that a changed-conditions clause exists "if there's an unforeseen circumstance that a contractor uncovers during construction and he needs to do some work, an additional amount of work beyond the contract documents that would change conditions."

these authorities are inapposite." *Id.,* 70 Ohio St.2d at 72, 24 O.O.3d at 146–147, 434 N.E.2d at 1352.

In this case, due to the organic soil problem, the parties agreed to modify the contract through a change order that provided for stones to be set in the bottom of the excavated northwest corner. The board consented in writing to these changes. Therefore, even if the contract included express waivers by the board, the jury was entitled to consider the *Spearin* doctrine. *Id.* See, also, *Foster Constr. C.A. v. United States* (1970), 193 Ct.Cl. 587, 435 F.2d 873, 887–888.

## Exception for "Obviously Flawed" Construction Plans

██ ██ Next, the board argues that the *Spearin* doctrine was inapplicable because Stechschulte, Peterson's superintendent, knew throughout the construction process that the school expansion in the northwest corner was being conducted on soft, organic soil. We agree that a contractor cannot rely upon the *Spearin* doctrine where the contractor had unique knowledge that the plans were obviously flawed and did not inform the owner. See, *e.g., Allied Contractors, Inc. v. United States* (1967), 180 Ct.Cl. 1057, 381 F.2d 995, 998–999. However, a complete reading of Stechschulte's testimony indicates that he heavily relied on the opinion of Dunbar's on-site soil engineer, Ben Backus. Therefore, Dunbar, which acted on behalf of the board, was aware of the daily status of the excavation. Second, the problem was hardly obvious, because Backus, an expert in soil excavation, did not immediately recognize the organic soil problem. Also, in the June 8, 1994 meeting to discuss the excavation, the organic soil problem was discussed with representatives of Dunbar.

Any information Stechschulte may have known about the excavation was not uniquely held, and the organic soil problem was not obvious. Therefore, the "obviously flawed" exception to the *Spearin* doctrine is not applicable to the facts of this case.

## Express-Warranty-by-the-Contractor Exception

██ Finally, the board insists the *Spearin* doctrine, an implied warranty, is overcome by the express warranties made by Peterson. See *Rhone Poulenc Rorer Pharmac. v. Newman Glass Works* (C.A.3, 1997), 112 F.3d 695. Specifically, the board points to Article 3.5.1 of the general conditions of the contract, which states that "[t]he Contractor warrants to the owner * * * that the work will be free from defects not inherent in the quality provided or permitted and that the work will conform with the requirements of the contract documents. Work not conforming to these requirements * * * may be considered defective." Also, in Article 3.5.2, the work was to be "free from all defects, including any defects in workmanship or materials," and "conform in all respects to the contract

documents." However, the board ignores the specific contractual provisions that can be reasonably interpreted to require Peterson to rely on Dunbar's recommendations.[4] Since the contract is reasonably open to interpretation, the express-warranty-by-contractor exception does not apply and the proper application of the *Spearin* doctrine was for the jury to decide. Accordingly, the second assignment of error is overruled.

*Judgment affirmed.*

POWELL, P.J., and KOEHLER, J., concur.

---

4. In addition to the final sentence of Sections 2100–3.02(A) and 2100–3.04(C), we note the following contract provisions:

Section 2100–2.02, FIELD QUALITY CONTROL, provides:

"A. Field quality control, including soils testing and inspection during earthwork operations, will be performed by SOILS ENGINEER RETAINED BY OWNER. Soils engineer will perform functions including, but not limited to, the following:

"1. * * *

"2. Provide supervision for the continuous monitoring of subgrade preparation, fill placement and compaction, including:

"a. Visual examinations at the Project site and bearing test as required to verify subgrade surfaces are adequate and meet or exceed design bearing values."

Section 2200–2.01(B), Excavation, Fill and Backfill, states:

"Soils engineer to inspect and test all footing excavations and floor subgrades to confirm soil bearing adequacy prior to placement of steel or concrete."