The SHERMAN R. SMOOT COMPANY OF OHIO, Appellant,

v.

OHIO DEPARTMENT OF ADMINISTRATIVE SERVICES, Appellee.

[Cite as *Sherman R. Smoot Co. v. Ohio Dept. of Adm. Serv.* (2000), 136 Ohio App.3d 166.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 98AP–1497.

Decided Jan. 27, 2000.

*Buckingham, Doolittle & Burroughs, L.L.P., Donald B. Leach, Jr.* and *Kenneth A. Fisher, Jr.; John Hardin Young,* for appellant.

*Betty D. Montgomery,* Attorney General, *William C. Becker, Peter E. DeMarco* and *Jon C. Walden,* Assistant Attorneys General, for appellee.

KENNEDY, Judge.

Plaintiff-appellant, The Sherman R. Smoot Company of Ohio ("Smoot"), appeals from a judgment of the Ohio Court of Claims awarding it $749,017.13 on its breach of contract claims against defendant-appellee, the Ohio Department of Administrative Services.

This action arises out of the state's construction of the Belmont Correctional Institution in Belmont County, Ohio. Construction of the prison was planned in several distinct phases. Although the entire project was overseen by a single project manager, the prime contracts, those for the general trades, the plumbing, the electrical, and the heating and cooling work, were bid separately for each phase of the project.

Smoot, a large construction company with expertise in concrete and masonry work, won the contracts to serve as the prime general trades contractor on phases III and IV of the project, for $8,436,600 and $3,828,000, respectively. Phase III involved the construction of seven prison support buildings, including the prison administration building, the infirmary, a segregated housing unit, and a large-food services building. Phase IV involved the construction of eight identical housing units.

The state issued a notice to proceed with phase III on September 18, 1993. The contract originally required work on phase III to be complete within four hundred twenty days, or by November 2, 1994. However, a thirty-day extension granted by the state moved the completion date to December 2, 1994.

The state issued a notice to proceed with phase IV on November 26, 1993. The contract originally required work on phase IV to be complete within three hundred thirty days, or by October 23, 1994. However, the state granted a thirty-day extension on phase IV as well, pushing the completion date to November 20, 1994.

During the course of its work on both phases III and IV, Smoot sought numerous change orders for additional compensation or an extension of time from the state. Several of Smoot's change order requests were granted, but most were not. It is these ungranted change orders that form the basis of Smoot's claims against the state. While Smoot's claims will be discussed in detail under their corresponding assignments of error, at issue herein are Smoot's claims for additional compensation for (1) differing site conditions that necessitated the use of "form footings," rather than "trench footings," for the wall footings on four of the seven phase III buildings; (2) the constructive acceleration of work on phases III and IV necessitated by the state's refusal to grant Smoot a time extension for weather-related delays occurring after January 31, 1994; (3) increased costs on phase III caused by the failure of Power City Plumbing and Heating ("Power City"), the prime heating and cooling contractor on phase III, to complete its work on schedule; and (4) increased costs on phase IV caused by Power City's failure to complete its work on schedule.

Smoot filed its complaint against the state in the Court of Claims on May 15, 1996. Smoot's complaint contained claims for breach of contract, equitable adjustment, breach of warranty, negligence, unjust enrichment, and quantum meruit, and sought damages in the amount $2,200,000, plus interest and costs.

Smoot's claims against the state were tried by the court beginning on April 20, 1998. On October 22, 1998, the Court of Claims issued a decision and a judgment entry awarding Smoot $749,017.13. Specifically, the Court of Claims awarded Smoot $350,866.84 on its claims for increased costs on phase III arising out of Power City's failure to complete its work on schedule, and a total of $202,183.50 on several minor claims that are not the subject of this appeal, plus prejudgment interest of $195,966.79 on these amounts. However, the Court of Claims found for the state on Smoot's claims for differing site conditions, constructive acceleration on phases III and IV necessitated by the state's refusal to grant a time extension for weather-related delays occurring after January 31, 1994, and increased cost on phase IV arising out of Power City's failure to complete its work on schedule.

Smoot appeals from the decision and entry of the Court of Claims assigning the following errors:

### Assignment of Error No. 1

"The trial court erred in denying recovery to Smoot of the additional costs it incurred on Phase III of the Project due to subsurface conditions which were materially different from those represented in the contract documents and soil-boring logs provided by the owner, the Department of Administrative Services."

### Assignment of Error No. 2

"The trial court erred in denying recovery to Smoot of the additional costs it incurred on the Project due to the refusal of the Department of Administrative Services to recognize contractually required, weather-related, time extensions on Phase III of the Project."

### Assignment of Error No. 3

"The trial court erred in denying recovery to Smoot of the additional costs it incurred on Phase IV of the Project due to the failure of the Department of Administrative Services to properly manage Power City, one of the Phase III prime contractors, and the refusal of the Department of Administrative Services to recognize contractually required, weather-related, time extensions on Phase III of the Project."

### Assignment of Error No. 4

"The trial court erred in denying recovery to Smoot of all of the additional costs it incurred on Phase III of the Project due to decreased labor productivity resulting from the failure of the Department of Administrative Services to properly manage Power City, one of the other Phase III prime contractors."

Preliminarily, the issues raised by Smoot's assignments of error involve the interpretation of contract language, as well as the review of the trial court's factual findings. Issues of contract construction and interpretation are questions of law. *Latina v. Woodpath Dev. Co.* (1991), 57 Ohio St.3d 212, 214, 567 N.E.2d 262, 264–265 Questions of law are subject to *de novo* review on appeal. *Wiltberger v. Davis* (1996), 110 Ohio App.3d 46, 51–52, 673 N.E.2d 628, 631–632. The trial court's findings of fact, however, are entitled to deference on appeal and will not be overturned so long as there is competent, credible evidence to support them. *State v. Harris* (1994), 98 Ohio App.3d 543, 546, 649 N.E.2d 7, 9.

Smoot's first assignment of error challenges the trial court's denial of its differing site conditions claim. Smoot's differing site condition claim alleges that the phase III contract indicated that the subsurface soil conditions at the phase III site would permit the wall footings for all phase III buildings to be constructed using "trench footings." In fact, the actual subsurface soil conditions encountered at the phase III job site required the wall footings for four of the

seven phase III buildings to be constructed using more expensive "form footings."

"Trench footings" are constructed by excavating a trench of the same size and dimensions as the planned footing. The walls of the excavation serve as the form into which concrete is poured to form the footing. Although trench footings are economical, they can only be used where the soil is cohesive enough to permit an excavation in the precise size and shape of the planned footings. In contrast, "form footings" are constructed by excavating a hole larger than the planned footing, then placing a temporary metal or wood form in the shape of the planned footing into the hole. Concrete is then poured into the form to form the footing. Once the concrete hardens, the form is removed and the area around the footing is backfilled. Form footings are more costly than trench footings due to the extra labor required to excavate the larger holes, place and remove the forms, and backfill around the finished footer. Smoot claims to have incurred considerable expenses over and above those it included in its phase III bid as a result of having to use form footings instead of trench footings on four of the seven phase III buildings.

According to the trial testimony, Smoot first encountered soil that would not permit the use of trench footings while preparing the foundation for the segregated housing unit. While attempting to excavate for trench footings, Smoot encountered large rocks, coal and shale that made the excavation of precise trenches impossible. Smoot notified the project manager who sent a representative to view the job site. Thereafter, the "associate architect" approved a change order granting Smoot $10,000 of additional compensation for the construction of footings for the segregated housing building. Smoot subsequently encountered similar soil conditions while attempting to excavate for trench footings for the infirmary, the administration building, and the food services building. However, Smoot's requests for change orders granting additional compensation for the extra work required to construct the footings for these three building were denied.

Differing site conditions claims arise from two separate and distinct circumstances, usually referred to as Types I and II differing site conditions. *H.B. Mac, Inc. v. United States* (C.A.Fed., 1998), 153 F.3d 1338, 1343; Cushman, Jacobsen & Trimble, Proving and Pricing Construction Claims (2 Ed. 1996), Section 7.2. A Type I differing site condition occurs where actual site conditions differ from the conditions indicated in the contract. A Type II differing site condition occurs where actual site conditions differ from conditions normally encountered in work of the character provided for in the contract. *Youngdale & Sons Constr. Co., Inc. v. United States* (1993), 27 Fed.Cl. 516, 528; *H.B. Mac, Inc., supra.*

Article 7(e) of the General Conditions section of the phase III contract contains a typical differing site condition clause that provides a basis for recovery for both Types I and II differing site conditions. Article 7(e) provides:

"Should the Contractor or Owner encounter or discover during the progress of the work, subsurface or latent physical conditions at the site differing materially from those indicated on the Contract documents [Type I conditions], or unknown physical conditions at the site of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract [Type II conditions], the Associate [Architect] shall be promptly notified in writing of such conditions before they are disturbed. The Associate will thereupon promptly investigate the conditions and if the Associate finds they do so materially differ from those indicated on the contract documents and cause an increase or decrease in costs of, or the time required for the performance of the Contract, an equitable adjustment will be made."

Smoot's differing site condition claim is a Type I claim, as the basis of the claim is that the phase III contract indicated that the subsurface soil conditions at the job site would be different than those Smoot encountered in performing the contract. To prevail on a Type I differing site condition claim, a plaintiff must show: (1) that its contract contains an affirmative indication regarding the subsurface or latent physical condition that forms the basis of the claim, (2) that the contractor interpreted the contract as would a reasonably prudent contractor, (3) that the contractor reasonably relied upon the contract indications regarding the subsurface or latent physical condition, (4) that the contractor encountered conditions at the job site that differed materially from the contract indications regarding the subsurface or latent physical condition, (5) that the actual conditions encountered by the contractor were reasonably unforeseeable, and (6) that the contractor incurred increased costs that are solely attributable to the materially different subsurface or latent physical condition. *Youngdale & Sons,* at 528; *Weeks Dredging & Contracting, Inc. v. United States* (1987), 13 Cl.Ct. 193, 218; Cushman, Jacobsen & Trimble, at Section 7.4.

The Court of Claims denied Smoot's differing site condition claim based upon its findings that Smoot relied on soil borings that were not part of the phase III contract documents in making its bid, and failed to inspect the job site prior to submitting its bid.

As part of its phase III bid package, the state made the results of a soils report on the phase III job site available to prospective bidders. The soils report was prepared by BBC & M Engineering, Inc., a geotechnical engineering firm, as part of the overall project design process. The soils report consisted largely of the results of a series of soil borings performed at the project site. Although the

soil borings were made available to bidders, the phase III contract contained the following disclaimers: Paragraph A of the "Supplementary Instructions To Bidders" provided as follows:

"A subsurface investigation by BBC & M Engineering, Inc. has been performed which is the basis for design. The Soils Report and Soil Boring Logs are available for review at the Project Manager's office for information purposes only, and are not considered a part of the Contract Documents. Such reports shall not be construed as guaranteeing conditions encountered anywhere on the site, or implying uniformity of subsurface conditions, but represent the best information available for design purposes. The Soils Report and Logs are not approved nor guaranteed in any manner by the Sponsor Agency or Associate. Use of the information is totally at the risk of the Contractor. Additional soils information, if needed by any Contractor, shall be obtained by the Contractor at no cost to the Associate or the State."

Paragraph F of the "Supplementary General Conditions" provided:

"No increase in the contract amount will be permitted for removal of any type of below grade material that appears in the Soils Reports."

Finally, "note (a)" of the "Instructions To Bidders" provided:

"Bidders shall inspect all Plans, Specifications and the site of the work."

In challenging the Court of Claims' denial of its differing site condition claim, Smoot argues that its conclusion, that the subsurface conditions at the job site would be suitable for trench footings, was based on the phase III contract rather than on the soil borings, and that a pre-bid site inspection would not have revealed the actual subsurface conditions.

Smoot is correct in its assertion that the phase III contract contained affirmative indications that the subsurface conditions at the phase III job site would permit the use of trench footings. Article 1 of the first section of the phase III contract expressly incorporated the phase III plans and specifications into the contract. Page S3–1 of the architectural plans for phase III portrays section views of typical foundation structures, including two different views of typical wall footings. Both of these drawings are clearly labeled "trench footing." In addition, Smoot's geotechnical expert, Daniel Longo, its project manager on the prison project, Scott Owen, and its Executive Vice–President, Theodore Beegle, each testified that the two drawings of typical wall footings depicted trench footings. Thus, the phase III architectural plans, which are expressly incorporated into the phase III contract by reference, contain affirmative indications that the subsurface conditions at the phase III job site would be consistent with the use of trench footings. *Appeal of J.F. Whalen* (Jan. 29, 1969), ENGBCA No. 2859 (holding that contract specifications requiring rock to be excavated to close

tolerances, constituted an affirmative indication that the subsurface conditions would permit such excavation using customary construction techniques).

Although the phase III plans support Smoot's differing site condition claim, the state argues that this fact is irrelevant, as the Court of Claims' finding that Smoot relied on the soil borings, rather than on the contract documents, in preparing its bid is supported by the evidence. In support of this argument, the state points to the minutes of a January 17, 1995 "Field Dispute Hearing" that was admitted into evidence as state's exhibit S.

State's exhibit S shows that, during the discussion of Smoot's differing site condition claim, Smoot Vice–President, George Robert "Pete" Crusse, indicated that Smoot based its bid "on the results of the soil borings," and claimed that "[b]ased on the boring report," Smoot should have been able to use trench footings. State's exhibit S provides sufficient, competent, credible evidence to support the Court of Claims' finding that Smoot relied upon the soil borings, rather than the architectural plans, in preparing its phase III bid. It is true that Smoot presented evidence indicating that it relied upon the project plans in preparing its bid. However, given the presence of state's exhibit S, Smoot's evidence merely served to create an issue of fact on the question of whether Smoot relied upon the contract documents or the soil borings in preparing its bid. The Court of Claims ultimately resolved this issue of fact in the state's favor, and we must defer to that resolution. *Harris.*

Still, the finding that Smoot relied upon the soil borings, rather than the architectural plans, in preparing its phase III bid does not, as the trial court apparently concluded, mandate the denial of Smoot's differing site condition claim as a matter of law.

 The *Spearin* doctrine holds that, in cases involving government contracts, the government impliedly warrants the accuracy of its affirmative indications regarding job site conditions. *Cent. Ohio Joint Vocational School Dist. Bd. of Edn. v. Peterson Constr. Co.* (1998), 129 Ohio App.3d 58, 65, 716 N.E.2d 1210, 1215; *United States v. Spearin* (1918), 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166; *Hollerbach v. United States* (1914), 233 U.S. 165, 34 S.Ct. 553, 58 L.Ed. 898; *Robert E. McKee, Inc. v. Atlanta* (N.D.Ga. 1976), 414 F.Supp. 957, 959. Further, where the information provided by the government was obviously intended to be used by bidding contractors in formulating their bids, the implied warranty of job site conditions will prevail over express contract clauses that disclaim any responsibility for the accuracy of information provided to contractors, and that require contractors to examine the site and check the plans. *McKee* (citing *Hollerbach,* at 172, 34 S.Ct. at 555, 58 L.Ed. at 901; and *Spearin,* at 137, 39 S.Ct. at 61, 63 L.Ed. at 169–170); *Rhone Poulenc Rorer Pharmaceuticals, Inc. v. Newman Glass Works* (C.A.3, 1997), 112 F.3d 695, 697–698; *Al Johnson Constr.*

*Co. v. United States* (C.A.Fed., 1988), 854 F.2d 467, 468; *Wunderlich v. State ex rel. Dept. of Public Works* (1967), 65 Cal.2d 777, 782–783, 56 Cal.Rptr. 473, 476, 423 P.2d 545, 548. Still, recovery will be denied under the *Spearin* doctrine where (1) a reasonable inspection of the job site by the contractor would have revealed the actual site conditions, or (2) the information provided by the government was accurate, but the conclusions drawn therefrom by the contractor differed from the actual site conditions. *McKee,* at 959–960.

■ The basis for the *Spearin* doctrine is the belief that it is unreasonable to expect every bidder on a government contract to perform expensive job site investigations, which the government is in a position to perform once for the benefit of all bidders. *McKee; Condon–Cunningham, Inc. v. Day* (1969), 22 Ohio Misc. 71, 88, 51 O.O.2d 144, 153–154, 258 N.E.2d 264, 274–275. To hold otherwise would reduce the number of bidders on government contracts, and increase the price of the few bids received. *McKee; Condon–Cunningham.*

■ In the present case, Smoot introduced uncontroverted evidence that the soil borings, like the architectural plans, indicated that subsurface conditions at the phase III job site would permit the use of trench footings. Smoot's geotechnical expert testified that the soil borings taken in the area where Smoot eventually found the soil to be unsuitable for trench footings indicated that the soils would support trench footings.

Further, it is apparent that the state intended the soil borings to be used by contractors in preparing their bids. In fact, the soil borings disclaimer, which the state included in its "Supplementary Instructions To Bidders," provides that the soil borings are for "information purposes" and "represent the best information available." Accordingly, Smoot was entitled to rely upon the soil borings in preparing its bid.

■ However, because the trial court found that Smoot did not conduct a pre-bid site investigation of the job site, the question remains whether a reasonable pre-bid investigation of the job site would have revealed the actual subsurface conditions.

Smoot does not challenge the trial court's finding that it did not conduct a reasonable pre-bid site investigation. Rather, Smoot contends that a pre-bid site investigation would not have revealed the conditions. The evidence reveals that the phase III job site was created by "cutting and filling" the site out of a hill. The evidence further reveals that the four buildings for which trench footings could not be used were at the south end of the job site. Smoot's geotechnical expert, Longo, testified that "[a]t the time of the bidding, the south end of the site was anywhere from 15 to 35 feet above the grade it is presently at." Smoot Executive Vice–President, Beegle, further testified that, when he visited the job

site shortly after Smoot was awarded the phase III contract, the site was still under construction. This uncontradicted testimony indicates that a pre-bid inspection of the relevant portion of the phase III job site would not have revealed the differing subsurface conditions, as the job site did not exist until after Smoot had been awarded the contract. Accordingly, Smoot's failure to conduct a pre-bid inspection of the job site does not foreclose recovery on its differing site condition claim.

Smoot's first assignment of error is sustained on the basis of our conclusions that Smoot's reliance upon the soil borings and its failure to conduct a pre-bid site inspection do not foreclose recovery on its differing site condition claim.

 Smoot's second assignment of error challenges the trial court's denial of its constructive acceleration claim arising out of the state's failure to grant it a time extension on the phase III contract for weather-related delays that occurred after January 31, 1994.

 Constructive acceleration occurs when a contractor has a justified claim for an extension of time, but is required to incur additional expenses because the project owner refuses to grant the extension and requires the contractor to complete the project by the original completion date. Cushman, Jacobsen & Trimble, at Section 6.3; *Contracting & Material Co. v. Chicago* (Ill.App. 1974), 20 Ill.App.3d 684, 691–692, 314 N.E.2d 598, 604. In order to prevail on a claim for constructive acceleration, it must be established that (1) that the contractor experienced an excusable delay entitling it to a time extension, (2) that the contractor properly requested the extension, (3) that the project owner failed or refused to grant the requested extension, (4) that the project owner demanded that the project be completed by the original completion date despite the excusable delay, and (5) that the contractor actually accelerated the work in order to complete the project by the original completion date and incurred added costs as a result. *Envirotech Corp. v. Tennessee Valley Auth.* (W.D.Ky. 1988), 715 F.Supp. 190, 192. A contractor who accelerates its work as the result of the denial of a justified time extension is entitled to recover its increased costs for labor, equipment, overhead and efficiency, as well as any lost profits. *Clark–Fitzpatrick, Inc. v. Gill* (1993), 1993 R.I. Super. 108, 1993 WL 853794.

In the instant case, Smoot alleges that it was entitled to a forty-day extension due to adverse weather conditions between February 1, 1994 and May 31, 1994; that it properly requested these time extensions, that the state refused to grant any weather-related time extensions for this time period, that the state demanded that it complete the project on schedule, and that it incurred increased costs as a

result of its need to accelerate its work in order to complete the project on schedule despite the weather-related delays.

Two provisions of the phase III contract are relevant to Smoot's weather-related constructive acceleration claim. Section (f), Article 6 of the "General Conditions" provides:

"It is further agreed that *Time is Of The Essence* of each and every portion of this Contract and of the Specifications wherein a definite and certain length of time is fixed for the performance of any act whatsoever; and where under the Contract an additional time is allowed for the completion of any work, the new time limit fixed by such extension shall be Of The Essence provided that *the Contractor shall not be charged with liquidated damages when the delay in completion of the work is due to:*

" * * *

"(2) *Unforeseeable cause beyond the control and without the fault or negligence of the Contractor, including* but not restricted to, *acts of God,* or the public enemy, acts of the Sponsor Agency, acts or omissions of another Contractor in the performance of a separate Contract with the Sponsor Agency, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, *and unusually severe weather*[.]" (Emphasis added.)

Paragraph E(h) of Part 2 of the "Supplementary General Conditions" provides:

"*The Contractor shall* not be entitled to additional compensation for delays resulting from causes beyond the State's control. Rain or other *precipitation or temperature within a range of twenty (20) percent of normal for the time of year covered by the Contract shall be expressly excluded from the definition of 'Acts of God,'* and it shall be the duty of the Contractor to take such action as necessary to protect against either damage or delays or both because of such circumstances." (Emphasis added.)

Smoot reads Part 2(E)(h) of the "Supplementary General Conditions" to provide that a daily precipitation or temperature that deviates from the normal precipitation or temperature for that day by more than twenty percent constitutes an "Act of God" or "unusually severe weather" for purposes of Section (f), Article 6 of the "General Conditions." Consistent with its reading of Part 2(E)(h), Smoot sought to establish its entitlement to a forty-day weather-related extension, through the introduction of National Weather Service data indicating that, during the period from February 1, 1994 through May 31, 1994, there were forty days on which the temperature or the precipitation deviated from the normal temperature or precipitation for a given day by more than twenty percent.

Smoot's reading of Part 2(E)(h) of the "Supplementary General Conditions" is simply erroneous. Part 2(E)(h) does not, as Smoot contends, provide that any daily deviation in temperature or precipitation of more than twenty percent shall entitle the contractor to a weather-related extension. Rather, the provision provides that the contractor shall not be entitled to a weather-related extension unless the precipitation or temperature on the day for which the extension is sought deviated from the normal precipitation or temperature for that day by more than twenty percent. Accordingly, where the precipitation or temperature on a given day deviates from the normal precipitation or temperature for that day by more than twenty percent, the question remains whether the weather on that day so interfered with the contractor's ability to work that it constituted an "Act of God" or "unusually severe weather" for purposes of Section (f), Article 6 of the "General Conditions."

Here, Smoot failed to establish that the weather on any of the forty days on which the temperature or precipitation deviated from normal by more than twenty percent constituted an "Act of God" or "unusually severe weather." While Smoot did present evidence that cold, rain, and snow often made working conditions at the phase III site very difficult, it presented no evidence that the weather actually prevented it from accomplishing any work at the site on any one of the forty days in question. In fact, Smoot's project manager for the prison testified that Smoot actually managed to do some work on every one of these days. Consequently, Smoot failed to establish its entitlement to an extension of one full day for any one of the forty days on which the temperature or precipitation deviated from normal by more than twenty percent. Nonetheless, Smoot still could have established that it was entitled to a weather-related time extension of less than forty days as a result of the cumulative impact of specific job delays that were caused by the weather on some or all of the forty days on which the temperature or precipitation deviated from normal by more than twenty percent. However, Smoot presented no evidence of specific weather-related work delays that occurred on any of the forty days.

Given Smoot's failure to prove that it was actually delayed by the weather in the completion of any phase III task, the trial court properly denied Smoot's weather-related constructive acceleration claim. Smoot's second assignment of error is overruled.

For organizational purposes, we will address Smoot's third and fourth assignments of error out of order.

■ Smoot's fourth assignment of error challenges the trial court's refusal to award it all of its increased phase III costs attributable to Power City's failure to timely complete its tasks.

At trial, evidence was introduced showing that Power City's failure to complete its work on time caused Smoot to incur increased labor costs of $307,513.05 on its phase III masonry work. William Schwartzkopf, an engineer specializing in construction cost problems, testified for Smoot that masonry crews, consisting of masons and mason-helpers, operate most efficiently when they are able to work on a given task from start to finish without interruption. However, due to Power City's delays, Smoot's masonry crews were often unable to complete one task before moving on to the next task. According to the testimony of Smoot's Vice–President Crusse, and Smoot's Project Manager Owen, the masons working on phase III were frequently unable to work straight through to completion on a given task because Power City had not completed a task that had to be done prior to the completion of the masonry work, and, which according to the phase III schedule, should already have been completed. Given these circumstances, Smoot was forced to have its masonry crews move back and forth between uncompleted jobs in order to keep them working.

According to Schwartzkopf, having the masonry's crews move back and forth between partially completed masonry jobs caused the crews to operate at less than peak productivity. Specifically, Schwartzkopf stated that this approach caused Smoot to incur the following increased masonry costs: $91,041.35 due to an increase in the number of hours worked by masons; $104,321.71 due to an increase in "direct masonry costs," such as buying or renting additional masonry supplies; and $112,149.99 due to an increase in the ratio of mason-helpers to masons.

The Court of Claims awarded Smoot the $91,041.35 that Schwartzkopf attributed to an increase in the number of hours worked by its masons, and the $104,321.71 that Schwartzkopf attributed to an increase in direct masonry costs. However, the Court of Claims denied Smoot's claim for the $112,149.99, which Schwartzkopf attributed to an increase in the ratio of mason-helpers to masons.

In denying Smoot's claim for costs attributable to an increase in the ratio of mason-helpers to masons, the Court of Claims held that Smoot had not proven its claims because it did not introduce any evidence that it needed to hire additional masons as well as additional mason-helpers. According to the Court of Claims, Smoot's need for an increased number of mason-helpers should have been accompanied by a corresponding need for an increased number of masons. Finding no evidence that Power City's delays caused Smoot to hire additional masons, the Court of Claims concluded that Smoot had no valid need for additional mason-helpers.

There is simply no support for the Court of Claims' view that if, Smoot's need for additional mason-helpers was legitimate, it would have been accompanied by a need for additional masons. In fact, the evidence contradicts this view.

Schwartzkopf specifically testified that Power City's failure to complete its work on time caused the ratio of mason-helpers to masons to increase from .58 to .788, and led to an increase in the number of masons' *hours* worked. Further, Crusse and Owens testified that moving masons back and forth between jobs dramatically increased the amount of preparatory masonry work, such as dismantling and erecting scaffolding, which the mason-helpers had to perform. Together, Schwartzkopf's, Crusse's, and Owen's testimony indicates that Power City's delays created enough additional preparatory masonry work that Smoot was forced to hire additional mason-helpers, while the additional actual masonry work created by Power City's delays was only enough to necessitate that Smoot's existing masons work extra hours.

The Court of Claims erred in denying Smoot's claim for costs attributable to an increase in the ratio of mason-helpers to masons. Smoot's fourth assignment of error is sustained.

 Smoot's third assignment of error challenges the trial court's refusal to award it the increased costs that it incurred on its phase IV contract as a result of Power City's failure to timely complete its phase III tasks.

At trial, Smoot introduced evidence that it incurred $207,239.03 in lost-productivity costs on phase IV due to Power City's delays on phase III. The Court of Claims denied Smoot's claim for these costs on the grounds that phase III and phase IV were separate and distinct contracts that Smoot was required to bid and man separately.

 The Court of Claims' reasoning in denying Smoot's claim for lost productivity on phase IV due to Power City's delays on phase III suggests that the court believed that damages incurred on one contract as the result of the breach of another unrelated contract are never legally recoverable. In fact, such damages, known as "special" or "consequential" damages, are legally recoverable. Cushman, Jacobsen & Trimble, at Section 13.3. For example, in *Downey, Inc. v. Bradley Ctr. Corp.* (App. 1994), 188 Wis.2d 435, 524 N.W.2d 915, a subcontractor on a sports arena project was able to recover the profits it lost on several unrelated projects as a result of being constructively forced to accelerate its work on the arena project. In order to comply with the constructive acceleration of its work on the arena project, the subcontractor had to divert equipment and manpower from the other projects. As a result of these diversions, the subcontractor was delayed in completing the other projects and suffered lost profits of over $800,000 thereon.

 However, in order to recover consequential damages suffered on an unrelated contract, the plaintiff must show that, at the time of entering into the primary contract, the defendant had reason to foresee that a breach of the

primary contract could cause the plaintiff to suffer damages on a second unrelated contract. *Combs v. Simkow* (Nov. 21, 1983), Butler App. No. CA82–12–0116, unreported (1983 WL 6596); *Downey,* at 445, 524 N.W.2d at 921.

In the instant case, there is no evidence in the record that indicates that the state had reason to know, at the time it entered into the phase III contract with Smoot, that delaying Smoot in the completion of its phase III responsibilities could cause Smoot to suffer damages on its phase IV contract. In fact, the only evidence on this point, the dates on which the two contracts were entered into, suggests that the state could not have foreseen that its breach of the phase III contract could cause Smoot to suffer damages on the phase IV contract. Specifically, the phase III contract indicates that it was entered into on August 27, 1993, while the phase IV contract indicates that it was entered into on November 19, 1993. Because the state and Smoot were several months away from entering into the phase IV contract when they entered into the phase III contract, the state could not have foreseen at the time it entered into the phase III contract that its breach of that contract could cause Smoot to suffer damages on the phase IV contract. Accordingly, the trial court properly denied Smoot's claim for damages suffered on phase IV as a result of Power City's delays.

Smoot's third assignment of error is overruled.

Smoot's first and fourth assignments of error are sustained, Smoot's second and third assignments of error are overruled, and the judgment of the trial court is affirmed in part and reversed in part, and this matter is remanded for further proceedings in accordance herewith.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

PEGGY BRYANT and DESHLER, JJ., concur.